NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200288-U

NOS. 4-20-0288, 4-20-0289 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 12, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* F.Y-J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 18JA70 |
| v.    (No. 4-20-0288) | ) | 18JA71 |
| Tammy J., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* L.J., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-20-0289) | ) | Honorable |
| Tammy J., | ) | Karen S. Tharp, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Knecht and Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the judgments of the trial court that terminated respondent's parental rights because the trial court's findings were not against the manifest weight of the evidence.

¶ 2         Respondent, Tammy J., is the mother of F.Y-J. (born October 2015) and L.J. (born October 2016). In February 2020, the trial court found respondent was an unfit parent, and in June 2020, it found termination of respondent's parental rights would be in the minor children's best interests. Respondent appeals, arguing that the trial court's (1) fitness

determinations and (2) best-interest determinations in each case were against the manifest weight of the evidence. We disagree and affirm the court's judgments.

¶ 3                                 I. BACKGROUND

¶ 4                                 A. Procedural History

¶ 5        In March 2018, the State filed separate petitions for adjudication of wardship, alleging, in relevant part, that F.Y-J. and L.J. were neglected minors as defined by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a), (b) (West 2016)) in that (1) they were neglected minors who were not receiving proper care and supervision necessary for their well-being and (2) their environment was injurious to their welfare due to unsafe and unsanitary conditions in the home. That same day, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 6        In July 2018, the trial court conducted an adjudicatory hearing. The State presented evidence that respondent had left the minors at home with their seven-year-old and five-year-old siblings without any adult supervision for several hours. The State also presented evidence that (1) there was no food in the home, (2) the living conditions were unsanitary due to (a) large amounts of trash in the home and (b) the children sleeping on the floor, and (3) the house was unsafe because the City of Springfield had inspected the building and determined the second floor was structurally unsafe and uninhabitable. The court found that (1) the State proved the allegations in paragraphs 1 and 2 of the petitions and (2) F.Y-J. and L.J. were neglected minors.

¶ 7        In August 2018, the trial court conducted a dispositional hearing at which it entered a written order finding that it was in the best interest of F.Y-J., L.J., and the public that

the minor children be made wards of the court and adjudicated neglected minors. The court further found respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minors, and it would be contrary to the minors' health, safety, and best interest to be in her custody. The court placed guardianship and custody with the guardianship administrator of DCFS. The written order also stated, "[T]he Court having admonished the parents that they must cooperate with DCFS, comply with the terms of the service plan, and correct conditions that require the minor to be in care, or risk termination of their parental rights."

¶ 8                                    B. The Termination Hearings

¶ 9            In August 2019, the State filed petitions to terminate respondent's parental rights in each case. The State alleged respondent was an unfit parent because she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare, (2) make reasonable efforts to correct the conditions that were the bases for the removal of the children within the nine-month period of July 2018 to April 2019, and (3) make reasonable progress toward the return of the children within that same nine-month period. 750 ILCS 50/1(D)(b), (m)(i), (ii) (West 2018).

¶ 10                              1. *The Fitness Proceedings*

¶ 11           In February 2020, the trial court conducted the fitness portion of the termination hearing to address respondent's parental fitness. The State first presented the testimony of Michelle Tremain, who was the caseworker on the case for DCFS between June 27, 2018, and August 16, 2018. Tremain testified that she took over a service plan that covered the period of March 2018 to September 2018. Tremain was not sure if the prior case worker gave respondent a copy of the service plan, but Tremain stated she gave a copy of the plan to respondent in person

on July 30, 2018. Respondent was recommended for the following services: (1) substance abuse assessment and treatment, (2) parenting, (3) housing, (4) employment, (5) domestic violence assessment, (6) regular visitation, and (7) individual counseling. Tremain stated all the necessary referrals were made for respondent.

¶ 12        Tremain testified that she sat in on an administrative case review (ACR) in September 2018 when she was handing the case off to another worker, Amber Jones. At that time, respondent had not engaged in any services except for the following: (1) respondent completed half of her initial assessment for individual counseling but then stopped attending and (2) respondent had supervised visitation with the children for two hours once a week. Respondent attended all visits except one, which she missed due to car trouble, and interacted well with the children.

¶ 13        Amber Jones testified that she was the caseworker on the case for DCFS and had been since August 2018. Jones indicated that the service plan she created at the September 2018 ACR contained the same service recommendations as the prior service plan. Regarding substance abuse, Jones stated that respondent completed an assessment in February 2019 and that assessment recommended outpatient treatment. Respondent either missed or failed every drug screen between September 2018 and March 2019. When she failed the screens, respondent tested positive for tetrahydrocannabinol (THC), the psychoactive chemical in cannabis. Regarding parenting classes, respondent completed those classes in January 2019.

¶ 14        Regarding mental health, Jones explained that respondent only completed half of the assessment because respondent had missed two appointments. Respondent was referred to a new provider in January of 2019 after the prior service provider stopped taking DCFS referrals. Respondent reported completing the mental health assessment in March 2019, but Jones stated

the new provider informed her it had no record of respondent attending her appointments.

¶ 15 Regarding domestic violence, Jones stated respondent did not complete the assessment between September 2018 and March 2019 and added that respondent was arrested for domestic battery in February 2019 after a physical altercation with her brother. Concerning housing and employment, Jones stated respondent obtained suitable, stable housing and employment in November 2018. Jones stated respondent was rated unsatisfactory on the service plan in March 2019 because she was "arrested for domestic battery," failed to start substance abuse treatment, and failed to complete a mental health assessment.

¶ 16 Jones testified that the next service plan covered the period between March 2019 and September 2019 and required all the same services as the prior plans. Respondent began outpatient treatment for substance abuse in April 2019 but was unsuccessfully discharged a month later for nonattendance. Respondent also continued to skip drug screens and, when she attended, tested positive for THC.

¶ 17 Jones noted that respondent maintained employment until she was "let go" in August 2019. Respondent also maintained housing but was evicted in July 2019. Jones testified that respondent completed a domestic violence assessment and a walk-in mental health assessment that resulted in a recommendation of no further services. Between September 2018 and February 2020, respondent attended 51 of 61 visitations. The visits were supervised and took place at respondent's home until she was evicted. During the relevant time period, respondent missed four visits, two because she had been arrested and two because she was sick. According to the reports Jones reviewed, respondent had good interactions with her children. Respondent brought snacks, clothes, and toys to her visits.

¶ 18 Respondent completed the domestic violence assessment in March 2019. There

was not a referral for further services following the assessment, however, Jones noted the assessment "[i]s a walk-in assessment that is pure self report. They ask several questions and based on the client's self report, there's a final answer given on if services are required or not."

¶ 19        Jones agreed that the delay in completing the substance abuse assessment was due to the service provider's long wait list and not because of respondent. Respondent decided to go to another provider on her own and completed the assessment in February 2019. Jones further agreed that during the nine-month period, respondent worked full time, primarily the night shift, at Hardees while attempting to complete her services. Jones clarified that respondent had four individual counseling sessions around April or May of 2018; respondent attended two and missed two. According to a counseling report from that provider, "due to [respondent's] being in denial of any current issues and not being fully transparent for the life of the case of the [*sic*] DCFS, she would not be a good candidate for counseling at that time." Respondent completed a mental health assessment in June 2019. According to Jones, "it stated due to [respondent's] self report, services were not deemed qualified at this time."

¶ 20        Jones explained that she qualified her responses by using the phrase, "due to the self report," to imply that respondent was not being honest with the service providers, which is why they were not recommending further services. Jones stated the housing respondent obtained was a one-bedroom apartment with no separate bedroom for the children. When asked if respondent had furniture that would be necessary to return the children home, Jones stated, "I don't believe so but I cannot recall."

¶ 21        Jones stated that substance abuse services were recommended because respondent disclosed ongoing cannabis use in the integrated assessment. The integrated assessment also recommended individual counseling based on respondent's report of "an upbringing of trauma

- 6 -

and then the current loss and separation of her children that warranted the clinician saying mental health counseling was a recommendation." Domestic violence services were required because respondent disclosed "ongoing domestic violence between her and [the minor children's father,] [a]s well as her and violence between another paramour."

¶ 22 Jones stated she was never close to returning the children home because, at the end of the nine-month period, respondent (1) had a domestic battery incident between her and her brother and (2) completed the domestic violence assessment, but never completed the mental health assessment. Jones further stated that she was concerned about returning the children to respondent. Jones stated, "Due to her continued aggression and anger towards all service providers, caseworkers, and constant criminal involvement, I was never able to say that the children would be safe returning home to her care." Jones gave an example of how respondent's aggression impacted visits, stating that one visit was cut short when respondent got in an argument with a supervisor who did not permit respondent and the children to deviate from the schedule and visit a park.

¶ 23 Respondent called Andrea Woolard, who testified that she supervised 30 of the visits between respondent and the minor children. Woolard started monitoring visits in March 2019 when respondent had weekly visitations. Visitations had since been reduced to once per month. Woolard stated the children were excited to see respondent before visits and respondent appeared to be applying what she learned in parenting class during visits. Woolard testified that she had one incident with respondent in which they got into an argument. Woolard explained that respondent wanted to take the children to the state fair and tried to make the change after Woolard had already arrived at the prearranged visitation location. The visit ended up being cancelled. That exchange was the only time respondent got upset with her. Woolard stated that

any conflict respondent may have had with her did not affect the visits.

¶ 24        Woolard stated respondent missed 10 visits but only 6 were respondent's fault. Respondent typically did not give notice of cancellation 24 hours before the visitation as required, instead calling just a couple of hours before. Respondent always brought the children food and drinks and frequently brought gifts including clothes, shoes, and toys. Woolard stated that the minor children's older siblings sometimes attended visits and the children were bonded with their siblings.

¶ 25        The trial court found that the State had proved all three allegations of unfitness listed in the petition—that is, that respondent failed to (1) maintain a reasonable degree of interest, (2) make reasonable efforts, and (3) make reasonable progress—by clear and convincing evidence. The court noted that although respondent had made progress with parenting, employment, and housing, respondent still had issues maintaining relationships and stability. The court was concerned that respondent did not complete (1) individual counseling or (2) substance abuse treatment. Regarding counseling, the court stated the evidence indicated that counseling was not recommended because respondent was in denial, something the court believed continued throughout the case. Respondent also never engaged in substance abuse treatment, which demonstrated poor judgment, something the court believed was the reason the children came into care: respondent's poor exercise of judgment. Further, the pattern of violence and anger in her personal relationships and interactions with caseworkers and providers gave the court substantial concerns. The court noted that, despite any progress respondent may have made, at the end of the nine-month period, the court would not have been in a position to return the children home in the near future. Accordingly, the court found respondent was an unfit parent.

¶ 26                            2. *The Best-Interests Proceedings*

¶ 27    In June 2020, the trial court conducted proceedings regarding whether it was in F.Y-J.'s and L.J.'s best interests to terminate respondent's parental rights. (The court noted the delay was attributable to the disruption in court services caused by the COVID-19 pandemic.) Jones testified that F.Y-J. was four years old and L.J. was three, and they currently lived with foster parents. The minors had been in that placement since February 2019 and were doing well. They were the only children in the home, and the foster parents wanted to adopt them.

¶ 28    Jones stated that the children referred to the foster parents as "mom" and "dad." Jones believed the children were bonded to the foster parents, the foster parents were meeting all of the children's cultural, religious, medical, and social needs, and it was in the minor children's best interests to have respondent's parental rights terminated so they could be adopted.

¶ 29    Jones commented that the children were taken into custody at the ages of two and one. Respondent originally had weekly visits, but the visits were reduced to once per month. The foster parents offered respondent the ability to call or video chat to increase the number of interactions between respondent and the children, but respondent had declined to take advantage of the offer. As a result, Jones opined that the attachment between respondent and the children was "severely lacking."

¶ 30    Jones agreed that respondent acted appropriately during visitations, brought food, toys, and clothes, and interacted well with the children. Respondent had last seen the children for a scheduled visit in February 2020. DCFS attempted to facilitate "videoconference visitation" after the COVID-19 pandemic began, but respondent never participated. In May 2020, the foster parents facilitated an in-person visit at an ice cream shop. The meeting was brief, there were no safety concerns, and respondent brought clothes to give to the children.

¶ 31    Regarding cultural and social needs, Jones explained that the minor children were

African American while the foster parents were not. The foster parents took the children "to specific places to have their hair done," gave the children culturally appropriate toys (for example, an African American Barbie doll), and had "other African American friends that are able to meet [the children's] needs that are different from a Caucasian person." In particular, the foster parents were friends with an African American couple with small children who got along well with F.Y-J. and L.J. The foster parents had a large social network with lots of friends and other children of similar age for the minor children to play with. Jones explained that the foster parents had expressed a willingness to maintain a connection with respondent if her parental rights were terminated.

¶ 32        Respondent testified that she contacted the foster parents in May 2020 because she had purchased clothes and shoes for the children and was hoping to see them because she had been unable to do so for a long time. She met the foster parents and her children at a Baskin-Robbins for about an hour. The children were excited to see her and called her "mom." Respondent mentioned that another one of her children, an older sibling to F.Y-J. and L.J., came with her. F.Y-J. and L.J. were bonded with both of respondent's older children (ages seven and nine). One lived in Springfield with her father, but the eldest lived with her father in Chicago and only came down to visit during summers. Respondent stated it was important for the minor children to have a bond and visit with their older siblings and that the minor children had begun to forget what the older two looked like.

¶ 33        Respondent acknowledged that the foster parents had offered electronic communication. She indicated that she texted with the foster parents often but her current work schedule and the children's bedtime made scheduling difficult. Respondent further stated that (1) she caused the case to be opened because she left the children home alone, (2) she had

- 10 -

learned a great deal in her parenting class—specifically, how to parent in a patient, caring way, which was the opposite of what respondent experienced with her own parents, and (3) she was clean and sober, using neither drugs nor alcohol. Respondent testified she could provide for all of the children's medical, religious, cultural, and social needs.

¶ 34　　　Respondent further acknowledged that housing was a problem. She explained the circumstances of her eviction as being related to the passing of her fiancé and her inability to pay off past-due bills and back rent. She was currently looking for housing and was having a hard time because of her eviction and COVID-19 restrictions. Respondent asked the court for forgiveness and the opportunity to continue to become more responsible. She was willing to do anything the court asked and expressed deep regret over her past actions. She stated she had learned so much and was ready to put her children first. Respondent acknowledged that the foster parents cared about her children and were willing to continue contact after termination because of how much they cared about them.

¶ 35　　　On cross-examination, respondent acknowledged that none of her children had been returned to her at any point during the case. Respondent agreed she failed to complete substance abuse treatment but disagreed that she was supposed to complete individual counseling. Respondent explained that a lot of confusion existed about whether services were required. She saw multiple providers, some who said she did not need counseling, but Jones told her she did. However, Jones could not find anyone to take DCFS cases. Respondent said she attended three referrals Jones made but "none of them could do anything." Respondent stated she only reached out to the foster parents once to ask to see the children because both she and the foster parents did not want to break DCFS rules.

¶ 36　　　Respondent agreed that she had not participated in any videoconferencing or calls,

either through DCFS or the foster parents, since the pandemic started. Respondent admitted that she could have done more to make the calls work. Respondent stated she was overcoming personal issues, distanced herself from everyone for a while, and it was her fault that e-visits did not occur. Respondent continued that after she was found unfit, she struggled emotionally and felt terrible about herself. Respondent stated it was a very hard time for her but she had pulled herself together and started interacting with the foster parents. Respondent agreed she had still not had a video chat with the minor children.

¶ 37    Respondent described her current living situation—she was staying at a Ramada hotel—and explained her criminal background and eviction made it difficult for her to get public or private housing. Respondent also discussed two legal cases she had. One, an order of protection that came out of a dispute with a roommate, had been dismissed. The other, a felony retail theft from June 2019, had been postponed, and respondent believed it would most likely be dismissed, but if not, she would not receive jail time. Respondent agreed that the foster parents were good people and could provide for her children but maintained that only she, as their mother, could provide them the love and care they deserved.

¶ 38    The trial court, after listing and considering all of the statutory factors, found that it was in the minor children's best interests to terminate respondent's parental rights. The court emphasized that the children had been in care for over two years, the majority of their lives. They had been with the foster parents for over a year, and those parents were able to provide not only material stability, but also permanency of love and care. The court stated it believed respondent loved her children and the case did not come down to who could provide more. Instead, the court believed that the children deserved to be with the foster parents who could provide the day to day stability and sense of permanency the children needed without wondering

what will happen to them. The court also noted that the foster parents had expressed a willingness to allow respondent contact with the children after adoption. Finally, the court noted that although it understood how difficult it could be for parents to go through the termination process, respondent's withdrawal and time away—although understandable—gave the court concern about her ability to provide the permanence the children required. As a result, the court found it was in the minor children's best interests to terminate respondent's parental rights.

¶ 39 Following the termination of respondent's parental rights in both cases, respondent appealed, and this court consolidated the cases on appeal for consideration.

¶ 40 II. ANALYSIS

¶ 41 On appeal, respondent argues that the trial court's (1) fitness determinations and (2) best-interest determinations in each case were against the manifest weight of the evidence. We disagree and affirm the trial court's judgments.

¶ 42 A. The Fitness Determinations

¶ 43 Respondent argues the trial court's findings that the State proved all three grounds of unfitness by clear and convincing evidence in each case were against the manifest weight of the evidence. It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805. Based on our review of the record, we conclude that the court's findings that respondent failed to make reasonable progress within the applicable nine-month period were not against the manifest weight of the evidence. Accordingly, we discuss only those findings.

¶ 44 1. *The Standard of Review*

¶ 45        A determination of parental unfitness involves factual findings and credibility

determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232,

¶ 21, 77 N.E.3d 69. A trial court's finding of parental unfitness will not be reversed unless it is

against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29, 115 N.E.3d 102.

A decision is against the manifest weight of the evidence when the opposite conclusion is clearly

apparent. *Id.*

¶ 46                          2. *Reasonable Progress*

¶ 47        The State must prove unfitness as defined in section 1(D) of the Adoption Act by

clear and convincing evidence. 750 ILCS 50/1(D) (West 2016); *N.G.*, 2018 IL 121939, ¶ 28.

Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make

"reasonable progress toward the return of the child" during any nine-month period following an

adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2016). The Illinois Supreme

Court has held that "[t]he benchmark for measuring a parent's reasonable progress under section

1(D)(m) of the Adoption Act encompasses compliance with the service plans and court's

directives in light of the condition that gave rise to the removal of the child and other conditions

which later become known that would prevent the court from returning custody of the child to

the parent." *In re K.P.*, 2020 IL App (3d) 190709, ¶ 36 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17,

752 N.E.2d 1030, 1050 (2001)). Likewise, this court has defined "reasonable progress" as

follows:

> " 'Reasonable progress' is an objective standard which exists when the court,
>
> based on the evidence before it, can conclude that the progress being made by a
>
> parent to comply with directives given for the return of the child is sufficiently
>
> demonstrable and of such a quality that the court, in the *near future,* will be able

- 14 -

to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991). See also *K.P.*, 2020 IL App (3d) 190709, ¶ 36.

¶ 48                              3. *The Trial Court's Finding in This Case*

¶ 49       Here, the State presented evidence that respondent never engaged in substance abuse treatment and failed to complete the mental health assessment within the nine-month period. Jones and Tremain stated that respondent failed to complete her mental health assessment. Respondent attended the first two appointments in April or May of 2018, but did not complete the assessment until June 2019, well outside of the nine-month window. Respondent had ample time to address the mental health assessment; the counselor did not stop seeing DCFS clients until the end of the year and respondent attended only two of four scheduled appointments. The fact that respondent completed other tasks in the service plan makes respondent's failure to complete a mental health assessment all the more glaring.

¶ 50       Moreover, respondent failed to complete outpatient substance abuse treatment. Respondent was unsuccessfully discharged because she failed to attend and tested positive for THC, something she did throughout the life of the case. Her continued use, even while in treatment, demonstrates the type of poor judgment that the trial court observed resulted in this case's being initiated. The trial court also emphasized respondent's history of being involved in domestic violence. Respondent admitted to domestic violence on the integrated assessment, was arrested for domestic battery in February 2019, and did not complete the domestic violence

assessment until March 2019.

¶ 51    At no point were the children close to returning home. Although not mentioned by the trial court, we believe it is noteworthy that respondent's visitation with the children never progressed to unsupervised visits, extended visits, or multiple visits per week. Jones expressed that she distrusted respondent because (1) her self-reports during assessments conflicted with responses in the integrated assessment and with her actions, including an arrest for domestic battery, and (2) respondent stated she completed the mental health assessment over two visits in the spring of 2019, but when Jones attempted to confirm the appointments, the service provider had no record of respondent's attendance. Further, respondent continued to have difficulties cooperating with the visitation supervisors, which sometimes resulted in shortened visits and, in one case, missing a visit entirely. The State presented evidence that respondent's apartment had only one bedroom and no place for the children to sleep.

¶ 52    The trial court considers whether a respondent parent has made reasonable progress such that the child may be returned in the near future. The record demonstrates that respondent never reached such a point. Although we note that defendant did make some progress—specifically, (1) obtaining housing and employment, (2) completing and applying what she learned in parenting classes, and (3) taking the initiative to complete a substance abuse assessment with another provider when DCFS's referral was delayed—such progress is insufficient to show that the trial court's decision was against the manifest weight of the evidence.

¶ 53    B. The Best-Interests Determinations

¶ 54    1. *The Applicable Law and Standard of Review*

¶ 55    At the best-interests stage of a termination proceeding, the State bears the burden

of proving by a preponderance of the evidence that termination of parental rights is in the child's best interests. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interests determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953; see also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 56 A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in the superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it was against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 57 2. *This Case*

¶ 58 The court noted that permanency was paramount in its decision making. The court

- 17 -

noted that respondent did not take advantage of the foster parent's offer to schedule videoconferencing or video chat during the COVID-19 pandemic. The children had spent over a year in the foster parent's care, a very large portion of their entire lives, and the foster parents provided for them day after day. The foster parents were willing to adopt, and they had a strong connection with the minor children. Respondent's period of withdrawal demonstrated to the trial court why putting her children first would be "easier said than done" for respondent. Finally, the court noted that the foster parents were willing to allow contact with respondent after adoption, a factor it indicated was in favor of termination. Accordingly, we conclude the trial court's findings that it was in the minor children's best interests to terminate respondent's parental rights in each case were not against the manifest weight of the evidence.

¶ 59                                III. CONCLUSION

¶ 60          For the reasons stated, we affirm the trial court's judgments.

¶ 61          Affirmed.