**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 200534-U

Order filed May 17, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* M.D, | ) | Appeal from the Circuit Court |
| | ) | of the Fourteenth Judicial Circuit, |
| a Minor | ) | Rock Island County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-20-0534 |
| | ) | Circuit No. 2017-JA-30 |
| v. | ) | |
| | ) | |
| Lindsey C., | ) | |
| | ) | The Honorable |
| Respondent-Appellant). | ) | Theodore G. Kutsunis, |
| | ) | Judge, presiding. |

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Lytton and Wright concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Orders finding respondent unfit to care for the child and subsequently terminating her parental rights were not against the manifest weight of the evidence. Additionally, the trial court did not abuse its discretion in denying respondent's motion to disqualify the prosecuting assistant State's Attorney.

¶ 2    The trial court found respondent, Lindsey C., to be an unfit parent to M.D. and subsequently terminated her parental rights. On appeal, respondent argues that the court's finding

of unfitness and termination order were against the manifest weight of the evidence. Respondent also argues that the trial court erred in denying her motion to disqualify the assistant State's Attorney who proceeded on the termination petition. For the reasons that follow, we affirm the trial court's termination of parental rights and its order denying respondent's motion to disqualify.

¶ 3                                                                  FACTS

¶ 4         On August 22, 2017, the State filed a petition for Adjudication of Wardship and a Petition for Temporary Custody of the Minor, M.D., born on October 24, 2013. The State alleged the child was neglected because respondent's substance abuse created an environment injurious to M.D.'s health and presented a substantial risk of harm. In support, the State alleged that when M.D.'s brother was born on August 10, 2017, he required treatment for withdrawal. The State also alleged that respondent had pled guilty to possession of methamphetamine in September 2016 and been sentenced to 30 months' probation. Finally, the State alleged that respondent had tested positive for cocaine and methamphetamine between March and August of 2017.

¶ 5         Respondent failed to appear at the first appearance hearing because she was in drug treatment. However, a relative caregiver, respondent's uncle Merle C., was present. Also present was the natural father of M.D., Joshua D. The trial court appointed a guardian *ad litem* for M.D., and the Public Defender to represent respondent. The court granted temporary custody of M.D. to the Illinois Department of Children and Family Services ("DCFS"). DCFS then filed an initial family service plan, requiring respondent to comply with psychiatric, domestic violence, substance abuse, and counseling services, engage in parenting education, and meet her probation requirements. The permanency goal was set as "return home within 12 months."

2

¶ 6 At a pre-trial conference held on February 16, 2018, respondent stipulated to the facts presented in the Petition for Adjudication of Wardship. Bethany for Children and Families (hereinafter "Bethany") filed a report on March 2; it recommended that the permanency goal remain return home within 12 months. An Integrated Assessment was also filed with the court on March 2, for which respondent, Joshua D., and the relative caregivers, Merle C. and Florence C., had been interviewed and M.D. and M.C. were also screened.

¶ 7 In her interview, respondent explained that her relationship with Joshua D. had lasted from 2007 to 2015, during which time they cohabited and engaged in substance abuse. Law enforcement had been contacted twice in 2011 when respondent and Joshua D. were under the influence of bath salts. Respondent described Joshua D. as sociopathic and narcissistic, but also stated that she loved him, visiting him twice a week when he was incarcerated. Respondent also reported that she had used methamphetamine, for which she had been arrested on possession charges. She also used Adderall, Xanax, and other unprescribed pills. She has been arrested twice for DUI, including once in 2014 when M.D. was four months old. At the time of her interview, respondent was engaged in intensive outpatient treatment through the Riverside Treatment Center. She related numerous traumatic events in her life, including sexual abuse by a sexual predator during her childhood, physical abuse by Joshua D., and the suicide of her brother. She also reported symptoms of depression, mania, anxiety, and anger control issues in her relationships.

¶ 8 After screening M.D., the Assessment Team reported that she was in excellent physical health, meeting all age-appropriate developmental milestones, and she appeared to be a happy and relaxed child. She was also reported to be strongly attached to respondent. As evidence of that attachment, the relative caregivers stated that she waits in a chair every Saturday and Sunday

3

in anticipation of her visitation time with respondent, and "squeals with delight" when she sees respondent approaching. Furthermore, the Team reported that respondent and Joshua D.'s genuine concern for M.D. and their desire to achieve reunification were seen as strengths within her family support system.

¶ 9        The Team believed that respondent did not fully appreciate the impact of her substance abuse on herself and on those around her, including M.D. It noted that she may have been less than forthcoming with her responses about her substance abuse history, noting vague answers, especially when questioned about drug use during pregnancy. The Team also expressed concern over her level of attachment to Joshua. The Team listed the prognosis for reunification of respondent and M.D. as "Guarded," pointing to its concerns regarding respondent's substance abuse, her relationship with Joshua D., and her lack engagement with treatment services. Success in these areas was deemed critical to achieving the goal of reunification. Supervised visitation was recommended for four hours each Saturday and Sunday.

¶ 10       The court entered a dispositional order on March 16. It adjudicated M.D. as neglected, and she was placed in the custody of Merle C. and Florence C., the relative caregivers. Guardianship remained with DCFS, and visitation was to be at the discretion of DCFS and Bethany. The court ordered respondent to (1) attend and successfully complete parenting classes, (2) obtain a substance abuse evaluation and follow any recommendations for treatment, (3) obtain a psychiatric evaluation and follow any recommendations for treatment, (4) obtain a domestic violence assessment and follow any recommendations for treatment, (5) cooperate with counseling, and (6) obtain and maintain appropriate housing and income.

¶ 11       DCFS filed permanency reports in June and September of 2018, both of which recommended the permanency goal remain as return home within 12 months. In a third

permanency report on November 30, respondent was found to have made unsatisfactory progress in all areas and she had pled guilty to possession of methamphetamine and was incarcerated in Iowa. Moreover, Bethany's caseworker Matykiewicz decreased respondent's visitation time with M.D. to one day a week for two hours due to respondent's repeated tardiness or failure to appear. This action resulted in text messages to the caseworker with profanity and name-calling. Nonetheless, the recommended permanency goal remained a return home with twelve months. On December 14, Bethany filed a status alert detailing the text messages between respondent and Matykiewicz, and a Facebook exchange between respondent and James Quist, concerning respondent's plans to move out of state with M.D. The court entered a new permanency order finding respondent had not made either reasonable and substantial progress or any reasonable efforts toward reunification.

¶ 12    DCFS filed two more permanency reports on March 1 and June 20, 2019, in which the permanency goal remained return home within 12 months. In the June report, respondent was found to have made satisfactory progress with substance abuse treatment because she was active in the Clean & Sober program at the Scott County jail in Iowa. However, the day before the June report was filed, Bethany filed a status alert, which recommended changing the goal to substitute care pending court decision on termination of parental rights. The court ordered that the goal be changed, and the State subsequently filed a supplemental petition to terminate respondent's parental rights. It alleged that respondent failed to make reasonable efforts or progress during two specific nine-month periods after the neglect adjudication: March 16 through December 16, 2018, and then December 17, 2018 through September 17, 2019.

¶ 13    A fitness hearing was conducted on March 12, 2020. Matykiewicz, her supervisor Lynn Lohman, and respondent testified at the hearing.

5

¶ 14    Matykiewicz testified that respondent had made neither reasonable efforts nor reasonable progress during the relevant periods. She noted that respondent failed to successfully complete substance abuse treatment, parenting and domestic violence service, and mental health treatment and had failed to provide verification of employment.

¶ 15    Matykiewicz testified that respondent did not comply with domestic violence services. Respondent did do some of the work in May 2019 when she was in the Scott County jail, but she did not complete the treatment. It was recommended that respondent participate in individual counseling and medication monitoring, but she never followed through with those services. Respondent did have an initial evaluation for substance abuse treatment. It was recommended she receive Level II outpatient treatment and she was referred to Riverside Access Center from which she was unsuccessfully discharged due to lack of attendance. Respondent's substance abuse treatment was sporadic throughout the life of the case and she never successfully completed that treatment. Matykiewicz testified that respondent completed drug drops only sporadically. She did not appear for some tests, and she tested positive for methamphetamine in July 2019. Matykiewicz stated that she had received from the Scott County Jail a certificate stating respondent had shown an interest in stopping the use of alcohol and drugs.

¶ 16    Matykiewicz indicated respondent had reported she was employed during the case, but never provided verification of employment. Respondent also did not provide any verification of income besides her oral statement. As for appropriate housing, respondent was residing with her mother throughout the life of the case. However, a home-safety check was never completed due to reports that respondent was bringing several unknown males to the house. Matykiewicz indicated that respondent's mother's home was not a return home option. Visits were supervised

6

and went "fine." Visits were initially once per week for two hours, but a decision was made to decrease to one hour due to respondent not calling, confirming on time, or arriving late.

¶ 17 On cross-examination, Matykiewicz testified she had taken the case over from Cindy Felske and had reviewed the documents Felske had prepared. Respondent was informed about services at child and family team meetings which were held every couple of months. Matykiewicz agreed respondent engaged in "a lot" of services, but she did not complete them. Matykiewicz indicated that pursuant to the 2018 service plan, respondent had received an evaluation at Robert Young in June 2018 and was prescribed medication. Respondent told Matykiewicz on June 20, 2018, that she had been engaged in substance abuse treatment for about six weeks. Matykiewicz verified with the treatment provider that respondent had been admitted to Level II treatment but was unable to confirm her actual therapist. Matykiewicz visited respondent at Scott County Jail once per month and testified that respondent participated in programming at the jail and during the rest of the case. Respondent resumed visitation after her release from Scott County Jail.

¶ 18 On redirect examination, Matykiewicz testified that respondent was expected to have medication monitoring after an updated assessment in June 2018 but had run out of medication at that time and she missed her appointment in July. Respondent did not complete her treatment at Riverside because she was discharged for lack of attendance. There was a positive drug test for methamphetamine in August 2018. Respondent reported at the February 2019 child and family meeting that she was not taking medication. Respondent did not re-engage in a substance abuse program after the initial discharge until she was in Scott County Jail. Respondent exhibited satisfactory parenting abilities at visits. After she was released from jail, Matykiewicz informed

7

respondent how she could complete services she had begun in jail, but respondent did not follow up on any of them.

¶ 19    Lynn Lohman testified that she was employed at Bethany as the division director for child welfare and placement and was the supervisor in this case throughout its history. She testified respondent's housing was never evaluated because her lack of progress in services precluded both home visits and a return home option. Matykiewicz left Bethany and respondent had two other caseworkers prior to her January 2019 incarceration in the Logan Correctional Facility.

¶ 20    Respondent was incarcerated at the time of the hearing and attended in the custody of the Department of Corrections. She was 32 years old and was currently in a romantic relationship with Robert V., whom she had known for 18 years. She had provided the caseworker with identifying information for Robert. She testified that her probation following a felony drug possession conviction in August 2018 had been revoked and she was sentenced in January 2019 for a two-year term. Her scheduled release date was January 12, 2021.

¶ 21    Prior to her incarceration, she had been employed part-time at a boarding and grooming company in Bettendorf, Iowa for about four and a half months and stated she had worked at Petco for almost three months. She did not get pay stubs from Petco, but she had shown Matykiewicz her work schedule. She claimed she was "technically" never unemployed during this case because she could do pet sitting and grooming from her house, which would make her self-employed. Respondent denied ever talking with Matykiewicz on the phone but claimed she left unanswered messages for Lohman multiple times. Throughout the case she lived in her mother's house in Moline. Her mother is elderly, has COPD, had had her hip replaced and required a walker and wheelchair to get around. From August 2017 until the end of February

2019, respondent's mother was living with the relative caregivers. During the case, respondent's boyfriend, her brother, and her cousin, had lived at the house. Respondent claimed that caseworker Cindy Felske completed a home-safety check. While incarcerated, a doctor known to her only as "Dr. Scott" prescribed medication that she had to have filled when she was released.

¶ 22       Respondent testified she went to the Robert Young Mental Health Center "at least eight times throughout a two-year course" and before that went to Country Oaks. Respondent stated she completed three out of five domestic violence courses at Scott County Jail with "Mara" from Family Resources. Respondent was unable to complete the program because Mara received a promotion, and the courses were no longer offered at Scott County Jail. She claimed she contacted Family Resources after she was released and was told she had to wait until classes began again and would have to start over. She attempted substance abuse treatment four times, twice with Riverside and twice with "CADS." She testified that she had completed 64 of 75 hours before she was taken into custody in Mercer County.

¶ 23       Respondent was also involved with Alcoholics Anonymous. She was on a waiting list for substance abuse treatment at DOC. The next group would start in a "couple weeks" and last approximately 11 weeks. She also signed up for values and relationship skills, "Mommy and Me Program," and domestic violence courses. She felt she had made valid efforts and attempts to complete her services. She learned how to appropriately behave around family members and friends, whom she should be around if she wanted to be a role model for her children and be a productive member of society. Respondent stated that she did not need additional services to parent her children. She did not provide pay stubs to verify employment because she "had one pay stub" and then shortly after the caseworker never asked for a pay stub and did not say she needed any other form of verification for employment at Petco.

9

¶ 24        After hearing arguments from the State, respondent, and the Guardian *ad litem*, the court orally issued its findings of fact and ruling. The court noted that after adjudication respondent was placed on probation, committed two new crimes, and was sent to prison. It also noted respondent did not successfully complete any substance abuse treatment program, the mental health counseling program, or a domestic violence program. Finally, the court noted respondent never provided verification of employment. The court stated that, listening to respondent testify, it appeared respondent had anger in her voice and was blaming Bethany and the caseworkers for her problems. It perceived respondent as someone who did not want to cooperate.

¶ 25        The court found that during the relevant period respondent did not put forth sufficient effort. It found the evidence both clear and convincing that respondent did not make reasonable progress during either period. It further found by clear and convincing evidence that respondent failed to maintain a reasonable degree of responsibility for the child's welfare throughout the case. The court held respondent was unfit by clear and convincing evidence. A written finding of unfitness and order as to respondent was filed March 16, 2020.

¶ 26        Bethany subsequently filed a best interest report. The report indicated M.D. was six years of age and had been in relative foster care since August 21, 2017. The minor's basic health, safety, educational, and well-being needs were consistently met by the relative caregivers. M.D. took dance lessons and was in her second year of lessons. She was a member of the YMCA where she took swimming lessons and participated in Kids Night Out monthly activities. It was reported M.D. was doing well in school. The relative caregivers had been married for 43 years. They resided in a two-bedroom home in Moline. They had worked for their employer for 30 years. M.D. was bonded to the foster parents and wanted to continue living with them. They wished to adopt M.D. Florence C., the foster mother, and M.D. spent a lot of time together doing

homework, activities, projects, and more. M.D. had two paternal siblings and one maternal sibling. She had regular contact with her maternal sibling and with other extended family members. The caseworker recommended that it was in the best interest of M.D. to terminate respondent's parental rights.

¶ 27    A best interest hearing was conducted on July 27, 2020. Vickie Wickersham, the caseworker on the file since December 2019, and respondent testified.

¶ 28    Wickersham testified M.D. had sibling visitation with her youngest sibling, her brother. Wickersham indicated that M.D. had contact with her two other siblings when she visited with her paternal grandmother prior to COVID-19. M.D. was placed in relative placement with her legal uncle. The relative caregivers were in their mid-60s. Merle C., the foster father, was diagnosed with cancer in April 2020 and was receiving treatment. He reported the cancer had not spread. Wickersham testified that, even if Merle C. passed away, Florence C. would still be able to adopt M.D. Visitation with respondent was to be continued while she was in DOC. However, visits were being arranged when COVID occurred, and no visits occurred. There were no restrictions on phone calls for M.D. Wickersham testified that, when respondent was released from prison, she requested visitation, which was scheduled. However, respondent subsequently went to jail in Iowa. She was then released from jail and was requesting visitation with M.D. Wickersham indicated that no one specifically asked M.D. about her desire for visitation.

¶ 29    With regard to her periods of incarceration, Respondent testified that she was sentenced on January 14, 2019, left Mercer County in January 2019, was in Logan Correctional for 38 days, then transferred to Decatur Correctional Center. Respondent was released from DOC on July 10, 2020. Respondent was taken into custody on a warrant for probation violation out of Scott County, Iowa, and held from July 13 to July 23, 2020. Respondent was currently on parole

11

from Illinois. Prior to going to prison, respondent had weekly visits with M.D. for one hour at the Bethany office. She was also allowed to call the foster home and talk to M.D. Respondent stated she called every day but talked to M.D. two to three times a week. She did not have visitation while she was in custody in Mercer, nor did she have any phone calls with the minor. She did not have visits while she was at Logan. She stated she tried calling while she was at Logan, but no one picked up.

¶ 30    Respondent did not have visits while she was at Decatur. Video visitation was allowed, but respondent asserted the foster mother would not allow it. She claimed she called every day while at Decatur, but she was only able to talk with M.D. twice. Respondent indicated that, during the phone calls, M.D. was very excited about talking to her. Respondent stated she wrote M.D. while she was incarcerated and received a card from M.D. When she was released from DOC, respondent immediately requested a visit. The visit was arranged for July 14, but she was picked up by Scott County on July 13. She was still on probation from Scott County. Respondent testified that now she has been released, she was going to be evaluated for treatment. She stated that this time would be different because "in six months I will be done with treatment" and she had a parole officer. She testified that the parole officer did not see any issues "as long as everything goes smoothly" and respondent did what she was supposed to do.

¶ 31    At the close of the arguments, the court presented its findings of fact and ruling. The court noted that M.D. had been with the relative caregivers for a significant period. M.D. understands her background, family ties, and her personal identity because the caregivers are related to respondent. The relative caregivers were both working and providing a home, dance lessons, and swimming lessons. They were acting as the parents, providing for M.D.'s health and safety with no indication that they could not continue to do so. The court stated it heard no

12

evidence that M.D. was not attached in any way to the relative caregivers. It also stated they could not wait forever for the parents to "get their act together." Finally, the court stated it had not heard any affirmative evidence that respondent was ready to "step into the shoes to be a mother." It indicated respondent had been given an opportunity all these years, but she had not taken advantage of it. The court found it was in M.D.'s best interest to terminate respondent's parental rights. It subsequently issued a written order of termination on December 18, 2020.

¶ 32        On September 29, 2020, respondent filed a joint motion with Joshua D. to disqualify Assistant State's Attorney Jeffrey S. McKinley because of an alleged conflict of interest. McKinley represented the State at all hearings regarding the case, except during a medical leave of absence from June to September 2020. The motion alleged that McKinley had a preexisting, undisclosed social relationship with M.D.'s foster mother, Florence C., through activities in local politics. Florence C. was Precinct Committeeman for the same political party for which McKinley was the local treasurer. Facebook postings were attached as exhibits demonstrating the relationship. (C706) The first exhibit is a post from August 1, 2020, with a correspondence between McKinley and Florence C. The second exhibit is a post from September 5, 2016 in which Florence C. voices her support for McKinley's campaign for Circuit Clerk and is shown marching in a parade on behalf of McKinley. Among other things, the motion requested that the court reinstate the permanency goal to return home within 12 months.

¶ 33        The court issued an order denying the joint motion. The court noted that the State's Attorney's discretion "under the Juvenile Court Act is not absolute," because any agency "may file a petition initiating a child protection proceeding." It further noted that if "a particular case passed a legal screen, DCFS is required to ask the State's Attorney to file a petition to terminate parental right" and the assigned attorney must file the requested petition if he "determine[d] that

13

statutory circumstances" warrant it. Finally, the court noted that, as a prosecutor, McKinley had a duty to act "in good faith free of any bias or prejudice." It found no evidence to conclude that McKinley "acted in bad faith in his handling of his case." It concluded that "the marching in parade or the holding the elected office of precinct committeeman while McKinley was a treasurer of the same political party did not rise to the level of conflict of interest" prohibited by the rules of professional conduct.

¶ 34    Respondent now appeals.

¶ 35                                    ANALYSIS

¶ 36    On appeal, respondent argues that the trial court erred in (1) finding her unfit, (2) terminating her parental rights, and (3) denying the joint motion to disqualify McKinley. We reject respondent's arguments and affirm the court's orders.

¶ 37            I.      The Termination of Respondent's Parental Rights

¶ 38    Parental rights may be involuntarily terminated where (1) the State proves, by clear and convincing evidence, that a parent is unfit pursuant to grounds set forth in Section 1(D) of the Adoption Act, and (2) the trial court finds that termination is in the child's best interests. 750 ILCS 50/1(D) (West 2019); *In re Donald A.G.,* 221 Ill.2d 234, 244 (2006). The State is not required to prove every ground it has alleged for finding a parent unfit. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 37 (citing *In re Gwynne P.*, 215 Ill.2d 340, 349 (2005)). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *Id.*

¶ 39    Pursuant to the Adoption Act, a parent is unfit if she failed "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2019). Reasonable

14

progress under section 1(D)(m)(ii) requires "demonstrable movement toward the goal of reunification." *In re C.N.*, 196 Ill.2d 181, 211 (2001). On review, the trial court's fitness determination will not be disturbed unless it is against the manifest weight of the evidence. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 38 (citing *In re Gwynne P.*, 215 Ill.2d at 354). A court's decision is against the manifest weight of the evidence where the opposite conclusion is clearly apparent. *Id.*

¶ 40    It was respondent's substance abuse problems that caused the removal of M.D. from her custody. We conclude that the evidence at the fitness showed that respondent failed to successfully complete any of the drug treatment services ordered by the trial court during the designated nine-month periods. In August 2018, respondent tested positive for methamphetamine. Bethany caseworker Matykiewicz testified that, during the relevant periods, respondent's participation in the drug treatment services was "sporadic" leading to her discharge for lack of attendance. Respondent did not re-engage in a substance abuse program after the initial discharge until she was held in Scott County jail. After her release in July 2019, respondent told Matykiewicz that she could complete the services she began in jail, but she did not follow up on any of them.

¶ 41    On a petition for termination of parental rights, once a finding of unfitness has been made, all considerations must yield to the best interest of the child. *In re O.S.*, 364 Ill. App. 3d 628, 633 (3rd Dist. 2006). At this stage of the proceedings, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re D.T.*, 212 Ill.2d 347 (2004). The trial court's decision requires consideration of statutory factors, including, *inter alia*: (1) the physical safety and welfare of the child, including food, shelter, clothing, and health; (2) the development of the child's identity; (3) the child's

15

background and ties, including familial, cultural, and religious; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties, including church, school, and friends; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preference of the persons available to care for the child. 705 ILCS 405/1–3(4.05) (West 2019). The trial court's task requires the court to balance these factors, weighing them at the first instance, and places the court "in a better position to see the witnesses and judge their credibility." *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71 (internal citations and quotations marks omitted). Thus, on review, we accord the trial court's determination in a termination proceeding great deference and will not reverse it unless it is contrary to the manifest weight of the evidence. *In re O.S.*, 364 Ill. App. 3d at 633.

¶ 42       The relevant factors in this case show that the trial court's termination order was not against the manifest weight of the evidence. First, the evidence on M.D.'s physical safety and welfare favors terminating respondent's rights. The best interest report indicated basic health, safety, educational, and well-being needs were consistently met by the relative caregivers. M.D. was in her second year of dance lessons and was taking swimming lessons. It was also reported M.D. was doing well in school.

¶ 43       Second, through her relative caregivers, M.D. had been able to maintain her family ties, and create a sense of attachments with her foster parents. The foster father Merle C. was respondent's uncle and M.D.'s legal uncle. Through him M.D. has been able to maintain her ties and develop her identity. M.D. had sibling visitation with her brother and maintained contact with her two other siblings prior to COVID-19 when she visited her paternal grandmother. Respondent also had visitation rights and unlimited access to M.D. via telephone until she was

16

arrested and incarcerated for drug possession. Although Merle C. has been diagnosed with cancer, he has since reported positive response to treatment. In addition, the report included evidence that M.D. had bonded with her foster mother Florence C., spending a lot of time doing homework, activities, projects and more. Caseworker Wickersham testified that even if Merle C. passed away, Florence C. would still be able to adopt M.D.

¶ 44　　　　Finally, the relative caregivers are in a better position to meet M.D.'s need for permanence and structure. At the fitness hearing, director Lohman testified that respondent lived in her mother's house and lacked independent housing. Moreover, her mother's home was never evaluated because respondent never progressed far enough in services to consider moving even the weekly visits to the home. There is no evidence that respondent has a suitable residence for M.D. and her brother or that she can earn sufficient income to secure appropriate housing.  By contrasts, the evidence showed that the caregivers had been married for 43 years. They resided in a two-bedroom home in Moline and had worked with the same employer for 30 years. M.D. was six years old at the time of the hearing and had been living with the relative caregivers for at least two years. Thus, the trial court's order terminating respondent's parental rights is amply supported by the manifest weight of the evidence.

¶ 45　　　　　　II.　　The Motion to Disqualify the Assistant State's Attorney McKinley

¶ 46　　　　A trial court's decision on whether to disqualify counsel will not be disturbed absent an abuse of discretion. *In re Estate of M.L.*, 2018 IL App (3d) 170712, ¶ 23. "An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court." *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997). A party seeking to disqualify opposing counsel bears a heavy burden of proving a conflict of interest. *In re Estate of M.L.*, 2018 IL App (3d) 170712, ¶ 22.

17

¶ 47	Respondent argues that the trial court erred in denying the joint motion to disqualify Assistant State's Attorney McKinley. In the motion, respondent and Joshua D. allege that McKinley had a pre-existing political relationship with Florence C. They make two specific claims: first, that McKinley was the treasurer of the same political party for which Florence C. served as a precinct committeeman; and second, that Florence C. participated in a parade in support of McKinley's political campaign for county clerk. On appeal, respondent contends that this political activity created a personal relationship that should be considered a conflict of interest, running afoul of Rules 1.7(a)(2) and 1.11 of the Illinois Rules of Professional Conduct. We disagree and affirm the trial court's denial of the motion to disqualify.

¶ 48	Illinois Supreme Court rules are interpreted under the same principles that govern the interpretation of statutes. *People v. Santiago*, 236 Ill.2d 417, 428 (2010). If the language of the rule is clear and unambiguous, the rule will be given its plain and ordinary meaning without resorting to further aids of statutory construction. *Id.* "One of the fundamental principles of statutory construction is viewing all the provisions of an enactment as a whole." *Id.* Words and phrases in a rule should be "interpreted in light of other relevant provisions of the statute." *Id.*

¶ 49	Rule 1.11 governs special conflicts of interest for current government officers and states that a lawyer currently serving as a public officer "shall not (i) participate in a matter in which the lawyer participated personally and substantially while he was in private practice or non-government employment; or (ii) negotiate for private employment with parties to a matter involving the government matter." Ill. R. Prof'l Conduct R. 1.11(d)(2). It incorporates by reference Rule 1.7. Ill. R. Prof'l Conduct R. 1.11(d)(1). Rule 1.7 prohibits a lawyer from representing a client in a matter that "involves a concurrent conflict of interest. Ill. R. Prof'l Conduct R. 1.7(a). Subparagraph (a)(2) states that such conflict exists where "there is a

18

significant risk that the representation of one or more clients will be materially limited *** by a personal interest of the lawyer." Ill. R. Prof'l Conduct R. 1.7(a)(2).

¶ 50 The conflict alleged by respondent and Joshua D. does not fit squarely within the type of conflicts recognized in the code, but we can derive some concepts against which to evaluate whether the alleged relationship requires disqualification. We conclude that there is no "significant risk" that McKinley's prosecution of the case was either "materially limited" or affected by the alleged personal relationship with Florence C. First, the political "connection" described in the motion is, standing alone, too attenuated to create the type of personal interest prohibited under Rule 1.7(a)(2). Although both Florence C. and McKinley were members of and held offices in the same political party, Florence C. had neither the ability nor the authority to determine the success of McKinley's campaign for electoral office. Nor did the motion allege or present any evidence that Florence C. offered McKinley any assistance greater than that of any other member of the Rock Island County electorate.

¶ 51 Second, a significant risk of material limitation was unlikely in such a case involving termination of parental rights. Although McKinley had discretion to proceed with the termination proceeding against respondent, his discretion was not absolute. "Any adult person, any agency or association by its representative may file, or the court on its own motion, consistent with the health, safety and best interests of the minor may direct the filing through the State's Attorney of a petition in respect of a minor under this Act." 705 ILCS 405/2-13(1) (2019). Under the statute, "the State's Attorney and the circuit court share the concurrent duty to ensure the best interests of the child, the child's family, and the community." *In re D.S.*, 198 Ill. 2d 309, 332 (2001).

¶ 52 In this case, Bethany filed a status alert, which recommended changing the goal to substitute care pending court determination on termination of parental rights. The court ordered

19

that the goal be changed consistent with that recommendation, and the State subsequently filed a supplemental petition to terminate respondent's parental rights. Thus, because the court exercised its discretion and its duty and ordered the change in status, we conclude that proceeding with the termination petition was not motivated by or initiated on account of any alleged political connection between McKinley and Florence C. We find no evidence of a conflict requiring McKinley's disqualification.

¶ 53                                    CONCLUSION

¶ 54        The judgment of the circuit court of Rock Island County is affirmed.

¶ 55        Affirmed