# Illinois Official Reports

## Appellate Court

---

### *In re C.P.*, 2019 IL App (4th) 190420

---

| | |
|---|---|
| Appellate Court Caption | *In re* C.P., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Takiara P., Respondent-Appellant). |
| District & No. | Fourth District<br>No. 4-19-0420 |
| Filed | November 21, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 18-JA-6; the Hon. John R. Kennedy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John B. Hensley, of Champaign, for appellant.<br><br>Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Presiding Justice Holder White and Justice Cavanagh concurred in the judgment and opinion. |

¶ 1     Takiara P., respondent, is the mother of C.P. (born November 4, 2017). In April 2018, the trial court found C.P. to be a ward of the court and vested guardianship of him in the Department of Children and Family Services (DCFS). In June 2019, the court held a best-interest hearing at which it terminated respondent's parental rights.

¶ 2     Respondent appeals, arguing (1) the trial court lacked jurisdiction to enter the dispositional order because respondent is also a minor and the State failed to serve her guardian in accordance with section 2-15 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-15 (West 2016)) and (2) the trial court's finding that it was in C.P.'s best interest to terminate respondent's parental rights was against the manifest weight of the evidence. We disagree and affirm.

¶ 3                                    I. BACKGROUND
¶ 4            A. The Petition for Adjudication of Wardship and Pretrial Hearing
¶ 5     In January 2018, the State filed a petition for adjudication of wardship, alleging C.P. was neglected because of respondent's mental illness. At the time the petition was filed and throughout these proceedings, the putative father, Davucci C., was incarcerated in the Department of Juvenile Justice. Respondent herself was a minor whose biological parents had their parental rights terminated in 2007. Respondent was adopted by her grandmother, but her grandmother died in 2013, and DCFS had been appointed to be her guardian. Respondent was personally served with a notice of the shelter care hearing on January 8, 2018.

¶ 6     Later in January 2018, the trial court conducted a shelter care hearing at which respondent appeared with court appointed counsel, the public defender.

¶ 7                          B. The Adjudication of Wardship
¶ 8     In March 2018, the trial court conducted an adjudicatory hearing. Respondent stipulated that C.P. was a neglected minor whose environment was injurious to his welfare due to respondent's mental illness. The court found that C.P. was two months old when the petition was filed, and that respondent had a history of ongoing mental health problems and difficulty controlling her anger when caring for her child.

¶ 9                          C. The Dispositional Hearing
¶ 10    In April 2018, the trial court conducted a dispositional hearing at which respondent appeared. The trial court found C.P. was neglected and it was in his best interest that he be made a ward of the court. The court further found that (1) the father and respondent were unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline C.P. and (2) the health, safety, and best interest of C.P. would be jeopardized if he remained in the custody of his parents. See *id.* § 2-27(1). The court also found that appropriate services aimed at preservation and family reunification had been unsuccessful in rectifying the conditions that led to the finding of unfitness and inability to care for, protect, train, or discipline C.P. *Id.* § 2-27(1.5)(a). Therefore, the court removed custody of C.P. from the parents and placed guardianship and custody in the guardianship administrator of DCFS. The court advised the father and respondent they were required to fully cooperate with DCFS or

they risked termination of their parental rights. The father appealed, and this court affirmed. *In re C.P.*, 2018 IL App (4th) 180310, ¶ 36, 115 N.E.3d 1056.

¶ 11                                    D. The Termination Hearing

¶ 12     In March 2019, the State filed a motion to find both parents unfit and to terminate their parental rights, alleging they (1) failed to make reasonable progress toward reunification during the nine-month period between June 2018 and March 2019 and (2) failed to maintain a reasonable degree of interest, concern, or responsibility for C.P.'s welfare. 750 ILCS 50/1(D)(b), (m)(ii) (West 2018).

¶ 13                                    1. *The Fitness Hearing*

¶ 14     In May 2019, the trial court conducted the parental fitness portion of the termination hearing. Respondent was not present, but respondent's attorney appeared on her behalf.

¶ 15                                    a. Richelle Gentry-Flemons

¶ 16     Richelle Gentry-Flemons testified she was the DCFS caseworker assigned to this case from March 2018 to March 2019. She testified that respondent was in teen parenting and parenting classes through Family Advocacy of Champaign County (FACC) while in the juvenile detention center. Respondent was there before Gentry-Flemons began work on the case in March 2018 and until respondent's release in June 2018, when respondent was placed in the Indian Oaks Academy (IOA). IOA is a residential facility for at-risk youth that provides housing, treatment, and education. At IOA, respondent received individual and group counseling, trauma-based therapy, equine therapy, and general education. Respondent was at IOA throughout the remainder of Gentry-Flemons's work on this case. Beginning in October 2018, respondent further received parenting classes from Aunt Martha's Health and Wellness (Aunt Martha's) in Kankakee.

¶ 17     Respondent visited C.P. twice a week for two hours each time, and she was supervised by (1) Mike Carter of Carter Visitation Homemaker Services, (2) IOA staff, and (3) Aunt Martha's staff. For the majority of visits, C.P. would be transported to IOA, but sometimes the visits would take place at Aunt Martha's in Kankakee, as well. Gentry-Flemons testified that respondent loved the visits with C.P. and consistently attended them. Respondent expressed concern about how C.P. was doing generally and in foster care.

¶ 18     Gentry-Flemons testified that respondent was in a number of physical altercations at IOA, most of which respondent claimed were someone else's fault.

¶ 19     Throughout her stay at IOA, respondent would occasionally run away. She ran away from IOA from August 2018 until September 2018, when she was returned on a warrant of apprehension. Afterward, she seemed motivated to engage in services so she could progress beyond IOA.

¶ 20     Respondent again ran away from IOA in January 2019, after Gentry-Flemons had left the case. However, respondent called Gentry-Flemons on the telephone twice in January 2019. The first time, respondent wanted to turn herself in but did not do so. The second time, respondent wanted to return to the juvenile detention center because she believed IOA and DCFS did not care about her and because she was having family issues.

¶ 21 Gentry-Flemons testified that, overall, respondent was doing a good job with the provided services and was doing very well in parenting classes. Respondent was attentive and learning C.P.'s needs. She thought respondent was benefitting from the services.

¶ 22                                        b. Meaghan Dugan

¶ 23 Meaghan Dugan testified that she was a milieu manager at IOA, where she worked with residents and also trained staff on trauma-informed care. Respondent was at IOA for just under a year, and Dugan saw her daily. Dugan took respondent to the horse stables for equine therapy, introduced her to yoga, and helped her acclimate to the living conditions. Dugan would occasionally help respondent "process" when she was angry, frustrated, or depressed.

¶ 24 Dugan explained that respondent initially had difficulty adjusting to IOA and ran away and fought with others a number of times. Respondent ran away in August 2018. When she came back, she was severely depressed and was hospitalized for suicidal ideations. Following the hospitalization, she stabilized for three to four months and then regressed. While respondent was gone, respondent was physically and emotionally abused by a boyfriend.

¶ 25 Dugan believed that around the middle of her stay at IOA, respondent began to truly put effort into her treatment and to attempt to control her behavior. However, in Dugan's opinion, respondent did not make progress in her services at IOA.

¶ 26 When respondent ran away again at the end of December 2018 or beginning of January 2019, IOA discharged her from the program because of the cost of holding an empty space for her. Until that point minimal progress had been made; respondent had four or five months of decreased aggression and more engagement in therapy, but respondent continued to use "deflection on where those behaviors came from."

¶ 27 Dugan testified that in October 2018, respondent physically attacked Dugan. On a different occasion, respondent attacked a male staff member from behind, and when Dugan intervened, respondent attacked Dugan as well. Respondent got into fights with her peers at school, and Dugan described her as verbally aggressive to staff and other youth.

¶ 28 Dugan testified that respondent talked about C.P., saying that she wanted to do what was best for him. When respondent was "in a negative headspace," she would sometimes struggle with whether or not she should keep custody of C.P. Respondent would often talk about milestones she had reached, her visits with C.P., and similar topics.

¶ 29 Dugan testified that after respondent ran away in January 2019, respondent called IOA twice on the telephone and talked with Dugan. The first time, respondent said she was not returning, did not want to be in the program, and wanted her belongings packed. Dugan responded that such matters were in the purview of DCFS. The second time, respondent thought her space at IOA was closed, and when Dugan informed her that it remained open, respondent seemed frustrated. Respondent ultimately said she would return but did not want to be screened at the hospital.

¶ 30 When respondent said she did not want to be at IOA, Dugan would discuss her reasons with her. Respondent complained that she was frustrated with the other girls and she was too far away from her family. Dugan tried to talk her through her issues with the other girls, and IOA and DCFS tried to provide visits with her family as much as was practicable.

¶ 31                                      c. Erica Foster

¶ 32    Erica Foster had been the DCFS caseworker since March 2019, succeeding Gentry-Flemons. Foster said that, in March, respondent had run away from IOA but returned later that month. Respondent again ran away on March 24 and did not return until April 18. When she returned, DCFS placed her with her brother, but she ran away again soon after. Finally, DCFS placed her in the foster home of Beth Blankenship, but she ran away from that placement as well.

¶ 33    At the time of the hearing in May 2019, respondent was on the run and had been so since April 21, 2019. Respondent had no visits with C.P. during Foster's tenure as caseworker, and Foster had spoken with respondent about the need for respondent to reengage with services.

¶ 34                                     d. Abigail Rogers

¶ 35    Abigail Rogers was a case manager for IOA, and respondent was one of her clients. She said that respondent engaged in individual and group counseling and therapy, equine therapy, case management services, and outside parenting classes. Rogers provided individual and group counseling through January 2019, when respondent last ran away from IOA. Rogers had not had contact with respondent since. Respondent did not complete services at IOA and still needed to address anger management, impulse control, and healing from trauma.

¶ 36    Rogers observed about 10 visits between respondent and C.P., all of which went well. They played with toys, she read him books, and she met his needs. Respondent improved in her interactions with C.P., in that she was less anxious when he had tantrums and was more adept at noticing when he needed a diaper change or was hungry. When C.P. became agitated, respondent picked him up, held him, and comforted him. When respondent was overwhelmed, she asked for help.

¶ 37    In counseling, Rogers and respondent focused on controlling respondent's anger, impulse control, and improving her coping skills. When she ran away in August 2018, counseling ceased until she returned. When respondent returned, she stabilized and engaged in more counseling. Respondent's behavior improved until she ran away in January 2019.

¶ 38                                    e. Toyia Washington

¶ 39    Toyia Washington was a therapist at IOA. She provided individual and group therapy services to respondent beginning in November 2018. Respondent's biggest issue was anger control. Initially, respondent struggled to make progress at IOA. Respondent disclosed two incidents in which Davucci C., C.P.'s father, abused respondent both physically and emotionally. Respondent made progress in therapy by talking about her problems and understanding the causes of her anger.

¶ 40    In November 2018, respondent began to regress. In January 2019, respondent did not want to engage in treatment, felt nothing was wrong with her, and wanted to go home. Respondent had mentioned to Washington that she wanted to raise C.P. and spoke about the future she wanted for him.

¶ 41    At the conclusion of the hearing, the trial court found respondent to be an unfit person under both counts of the State's petition, and in May 2019, the court entered a written order to that effect.

¶ 42                                         2. *The Best-Interest Hearing*

¶ 43        In June 2019, the trial court conducted a best-interest hearing at which respondent appeared. Respondent had earlier been placed with family in Danville. Respondent made a statement to the court in which she said, "Judge Kennedy, I'm willing to do whatever needs to be done to reunite with my son because I feel like when he came into my life, that's the one who filled in my heart when my grandma had died, so I feel that I'll do whatever needs to be done to be back into my son's life."

¶ 44        The trial court considered a best interest report filed by DCFS in June 2019, stating that respondent at the time of the report was at Aunt Martha's emergency shelter. Respondent was 16 years old and unemployed. She had made notable progress in parenting but less progress in other services. That same month, respondent had been diagnosed with bipolar disorder and was awaiting a prescription of Depakote.

¶ 45        C.P. remained in the custody of Erika Campbell in Champaign, where he had been since he was a month old. He had a strong bond with Campbell and her two children, was receiving medical care, was enrolled in daycare, and was in need of no services. Campbell was prepared to provide permanency. DCFS recommended the termination of respondent's parental rights.

¶ 46        The trial court considered the reports, the additions offered by the attorneys, the recommendations of the attorneys, the prior finding as to parental unfitness, and the fact that C.P. was about 19 months old. The court noted that both the DCFS report and the guardian *ad litem* had outlined and analyzed the best interest factors, and the court believed those factors were analyzed correctly. The court noted that C.P., "like any child, particularly a child his age, needs a safe, stable, consistent, nurturing home to grow up in. And the evidence is absolutely clear, and I'm sorry to say that that cannot be provided for either with [the respondent father] or with the respondent mother ***."

¶ 47        The trial court explained that:

> "[c]onsidering the evidence, the recommendations, I think considering the best interest factors—and I'm going to go to particularly the child sense of security, familiarity, continuity, the least disruptive placement, physical safety and welfare of a child, those are the ones that most stand out—but really the factors taken as a whole favor termination of the parental rights of each of the respondent parents."

¶ 48        The trial court determined by clear and convincing evidence that it was in the best interest of C.P. that respondent's parental rights be terminated.

¶ 49        This appeal followed.


¶ 50                                              II. ANALYSIS

¶ 51        Respondent appeals, arguing (1) the trial court lacked jurisdiction to enter the dispositional order because respondent is also a minor and the State failed to serve her guardian in accordance with section 2-15 of the Act (705 ILCS 405/2-15 (West 2016)) and (2) the trial court's finding that it was in C.P.'s best interest to terminate respondent's parental rights was against the manifest weight of the evidence. We disagree and affirm.

¶ 52                  A. The Trial Court Had Jurisdiction to Enter the Dispositional Order

¶ 53      Respondent argues that the trial court lacked jurisdiction to enter the dispositional order because respondent is a minor and the State failed to serve her guardian in accordance with section 2-15 of the Act. *Id.* We disagree.

¶ 54                                 1. *The Applicable Law*

¶ 55      Resolution of this case depends upon the interpretation of a statute. The rules governing statutory interpretation are well settled. The cardinal rule of statutory construction is to ascertain and give effect to legislative intent. *In re C.P.*, 2018 IL App (4th) 180310, ¶ 18. " 'The most reliable indicator of that intent is the plain and ordinary meaning of the statutory language itself.' " *Id.* (quoting *In re Jarquan B.*, 2017 IL 121483, ¶ 22, 102 N.E.3d 182). When construing the provisions of the Act, the court should read the Act as a whole, construing words and phrases in light of the other relevant portions of the statute and not as isolated provisions. *Id.* Statutes should be construed to avoid absurd results. *Id.* Questions of statutory interpretation present issues of law and are reviewed *de novo*. *Id.*

¶ 56      Section 2-15 of the Act addresses which persons are to be served in neglect proceedings, as well as how they are to be served, and provides as follows:

> "(1) When a petition is filed, the clerk of the court shall issue a summons with a copy of the petition attached. The summons shall be directed to the minor's legal guardian or custodian and to each person named as a respondent in the petition, except that summons need not be directed to a minor respondent under 8 years of age for whom the court appoints a guardian *ad litem* if the guardian *ad litem* appears on behalf of the minor in any proceeding under this Act.
>
>                                      \* \* \*
>
> (5) Service of a summons and petition shall be made by: (a) leaving a copy thereof with the person summoned \* \* \*; (b) leaving a copy at his usual place of abode with some person of the family \* \* \*; or (c) leaving a copy thereof with the guardian or custodian of a minor \* \* \*." 705 ILCS 405/2-15(1), (5) (West 2016).

¶ 57      Previously, this court has concluded that "the minor" in the context of section 2-15 refers to the minor who is the subject of the neglect proceeding. *In re C.P.*, 2018 IL App (4th) 180310, ¶ 25. We reached that conclusion based upon (1) the context of the statutory language in Section 2-15 of the Act, (2) the rule to construe statutes to avoid absurd results, and (3) legislative history. *Id.* ¶¶ 25-28.

¶ 58                                 2. *This Case*
¶ 59              a. "The Minor" Does Not Mean a Minor Who Happens
                                  to Be a Respondent Parent

¶ 60      In *In re C.P.* we noted that the language of section 1-5(1) points to "the minor who is the subject of the proceeding" and in that context, "the minor" is the minor who is the subject of the proceeding, not *any* minor who is involved in the case. See *id.* ¶ 25. In this case, we see no reason to apply a different definition. Accordingly, we hold that "the minor" here refers to C.P., not to respondent, who is C.P.'s mother and who also happens to be a minor herself.

¶ 61                    b. Respondent's Mental Illness Does Not Change This Analysis

¶ 62        Respondent further argues that because the trial court acknowledged her mental health problems and that she had been adjudicated a ward of the court with DCFS appointed as her guardian, this somehow changes the above analysis and required that DCFS was a necessary party who needed to be served in its capacity as respondent mother's guardian. In support of this contention, respondent cites *In re K.C.*, 323 Ill. App. 3d 839, 841-42, 753 N.E.2d 314, 316 (2001), in which the respondent mother had a plenary guardian appointed for her because the respondent mother "was adjudicated disabled." The appellate court ultimately decided that the plenary guardian was a necessary party. *Id.* Respondent also cites section 1-5(1) (705 ILCS 405/1-5(1) (West 2016)), but respondent concedes that this section does not name the personal guardian of a minor parent as among those with a right to be present at or participate in these proceedings.

¶ 63        Respondent's argument fails because, although she has mental health problems, anger problems, and was diagnosed with bipolar disorder, nothing in the record suggests she was disabled. The trial court never found or even suggested she was disabled, and no party ever claimed she was disabled. The law that provides for plenary guardians "empowers courts of this state to appoint plenary guardians of the person for adults who *lack the ability to care for themselves and manage their own lives*." (Emphasis added.) *In re K.C.*, 323 Ill. App. 3d at 841. The notion that a person who is merely diagnosed with bipolar disorder rises to this level is totally unfounded.

¶ 64        Because respondent's authority addresses only people with disabilities who have had plenary guardians appointed for them, we find that authority readily distinguishable from the case at hand. Here, no plenary guardian had been appointed, and there is no evidence whatsoever that respondent's illness rose to the level of disability. To the extent that respondent suggests that the procedures described for plenary guardians could equally apply to anyone (like respondent) who has (1) a guardian and (2) a mental illness, we reject that suggestion.


¶ 65           B. It Was in C.P.'s Best Interest to Terminate Respondent's Parental Rights

¶ 66        Respondent argues the trial court's finding that it was in C.P.'s best interest to terminate respondent's parental rights was against the manifest weight of the evidence. We disagree.


¶ 67                                    1. *The Applicable Law*

¶ 68        A reviewing court will not disturb the trial court's decision regarding a child's best interests and the termination of parental rights unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly the proper result. *Id.*

¶ 69        Following a finding of unfitness, the focus shifts to the child. *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004). At the best-interest hearing, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *Id.* The trial court must give full and serious consideration to the child's best interests. *Id.*

¶ 70    When considering whether termination is in the child's best interest, a trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least[-]disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 52.

See also 705 ILCS 405/1-3(4.05) (West 2016).

¶ 71    At the best-interest hearing, "the State must demonstrate by a preponderance of the evidence that termination of parental rights is in the minor's best interest." *In re D.T.*, 212 Ill. 2d at 349. "This court accords trial court decisions in termination proceedings great deference because the trial court is in a better position to see the witnesses and judge their credibility." *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53.

¶ 72                          2. *This Case*

¶ 73    In this case, the trial court's finding was not against the manifest weight of the evidence. In coming to its conclusion, the court noted that it agreed with the best interest hearing report and the report's analysis of the best interest factors. The court noted that "particularly the child's sense of security, familiarity, continuity, the least disruptive placement, physical safety and welfare of a child, those are the ones that most stand out, but really the factors taken as the whole favor termination of the parental rights of each of the respondent parents."

¶ 74    The report listed every factor in section 1-3(4.05) of the Act and provided its analysis of those factors. In summary, it described that C.P. was doing very well with Erika Campbell, she provides him love and support, and he has lived with her nearly his entire life and therefore has a sense of security, love, and belonging with her and her children. All of the factors seemed to indicate that it would be best for C.P. to remain with Campbell. The report further documented that respondent had been on the run since January 8, 2019, and therefore missed visits and contact with C.P., and she had not been engaged in her services during that time period.

¶ 75    Respondent argues that she has not had adequate time to overcome her mental illness. She also argues that multiple witnesses indicated that respondent consistently attended and loved her visits with C.P., and that she was often concerned for his welfare. She made progress in parenting classes and had expressed her desire to be a parent to C.P. Respondent further argues that she and C.P. had established a bond.

¶ 76    We do not dispute the majority of these claims, save for the assertion that respondent consistently visited C.P. The record demonstrates that respondent did not see C.P. when she ran away from IOA. However, even taking respondent's argument as true, they are beside the point because respondent has failed to show that the trial court's finding was against the manifest weight of the evidence.

¶ 77    The determination the trial court made was not about whether respondent was making efforts, or whether she loved C.P. The only question for the trial court to appropriately consider was what was in the best interest of C.P.

¶ 78    C.P. had been in a loving and caring environment with Campbell for nearly his whole life. She provided him health care, childcare, and the food and shelter that he needed. She provided him stability, and they had a bond. She expressed a willingness to provide permanency for C.P.

¶ 79    Our review of the record, and in particular the trial court's statement at the best-interest hearing, demonstrates that the trial court appropriately considered the evidence before it and each of the statutory factors under section 1-3(4.05), therefore warranting its decision to terminate respondent's parental rights.

¶ 80    We conclude that the trial court's finding that it was in the best interest of C.P. to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 81                                    III. CONCLUSION
¶ 82    For the reasons stated, we affirm the trial court's judgment.

¶ 83    Affirmed.