**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 210185-U

Order filed September 21, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* R.A., C.B., & A.S., | ) | Appeal from the Circuit Court |
| | ) | of the Tenth Judicial Circuit, |
| Minors, | ) | Peoria County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal Nos. 3-21-0185, 3-21-0186 |
| Petitioner-Appellee, | ) | and 3-21-0187 |
| | ) | Circuit Nos. 18-JA-314, 18-JA-315, & |
| v. | ) | 19-JA-108 |
| | ) | |
| Betsy A., | ) | |
| | ) | |
| Respondent-Appellant). | ) | The Honorable |
| | ) | Timothy Cusack, |
| | | Judge, presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Schmidt and Daugherity concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: Orders finding respondent unfit to care for the minors and subsequently terminating her parental rights were not against the manifest weight of the evidence.

¶ 2     The circuit court found respondent, Betsy A., to be an unfit parent to R.A., C.B. and A.S. It subsequently terminated her parental rights. On appeal, respondent argues that the court's

finding of unfitness and termination order were against the manifest weight of the evidence. For the reasons that follow, we affirm the circuit court's finding of unfitness and its termination order.

¶ 3                                    BACKGROUND

On September 4, 2018, the state filed petitions for adjudication of neglect regarding the minors R.A. (born January 15, 2011) and C.B. (born January 13, 2018). The petitions alleged that on August 28, 2018, police officers went to the minors' home and found: four dogs, two cats, three rabbits and a ferret; animal feces piled up in the living room and in mop bucket; a "bad smell" causing difficulty in breathing; and flies, fleas, and cockroaches. The petitions also alleged that, on August 31, 2018, a caseworker from the Illinois Department of Children and Family Services (DCFS) visited the home and found it in the same condition, but the main floor was cleaned. On September 5, 2018, temporary shelter care orders were entered. On January 18, 2019, adjudicatory orders were entered finding the petition proven by a preponderance of the evidence and that the minors were neglected. On March 8, 2019, the circuit court entered a dispositional order regarding the care of R.A. and C.B.

¶ 4        On April 12, 2019, a petition for adjudication of neglect was filed as to A.S. (born April 9, 2019). The petition alleged that respondent was previously found unfit relating to R.A. and C.B. because of unsanitary conditions of the home; that respondent had not completed services ordered in the prior cases; that respondent was residing with Crystal Groscalude, who had been found unfit in a separate juvenile case on November 20, 2018; and that the putative father of A.S. resided in the unsanitary home at the time of respondent's previous unfitness finding. On April 15, 2019, a temporary shelter care order for A.S. was entered. On June 21, 2019, the court

entered an adjudication order, finding A.S. to be neglected, and entered a dispositional order regarding the care of A.S.

¶ 5        In both the March 8 and June 21 dispositional orders, the circuit court ordered respondent to: (1) execute all authorizations for release of information; (2) cooperate fully and completely with DCFS; (3) participate and successfully complete counseling; (4) participate in and successfully complete a parenting course or parenting classes; (5) obtain and maintain stable housing conducive to the safe and healthy rearing of the minors; (6) provide to the caseworker any change of address, phone number, or members of household within three days; (7) provide to caseworker information as to any person with whom DCFS has reason to believe a relationship exists or had developed which would affect the children; and, (8) visit the minors as scheduled. On September 17, 2020, petitions for termination of parental rights were filed. The petitions alleged respondent was unfit pursuant to 750 ILCS 50/1(D)(m)(ii) (West 2020), in that she failed to make reasonable progress toward the return of the minors during the nine-month period of October 1, 2019, to July 1, 2020.

¶ 6        The adjudication hearing on the petitions for termination of parental rights began on January 28, 2021.The State called Amy Duffield who testified she was a child welfare advanced specialist for DCFS and was the caseworker for the minors in these cases. Duffield stated she had been the caseworker during the entirety of the case which began in September of 2018. The reasons for protective custody were due to the environment of the home being hazardous for the children's welfare. Duffield testified that respondent had completed a parenting class, a psychological evaluation, and attended counseling with some regularity between October 1, 2019, and July 1, 2020. One service offered to respondent was "Partnering with Parents," which

3

was a support group for parents to learn various skills such as budgeting and time management. The program was voluntary, and she attended when she wanted to do so. Respondent only attended a handful of sessions and then informed Duffield she no longer wanted to attend because she did not have transportation. Duffield testified that DCFS offered bus passes to respondent, but respondent refused them.

¶ 7        Duffield testified that, beginning in November of 2019, the agency began doing unannounced visits because they wanted to ensure respondent could maintain the home throughout the week and not just clean right before someone was coming over. On November 7, 2019, Duffield visited the home and knocked on the door for a couple of minutes, and no one answered. On November 8, 2019, Duffield again visited, but no one answered. However, on that date, Duffield observed a rug hanging on the railing and there was dried animal feces on the rug. Between November 8, 2019, and April 13, 2020, Duffield attempted to visit respondent's home monthly, but she was not allowed inside. In February of 2020, Duffield went to the home, but respondent stepped outside and spoke to Duffield on the porch. Respondent told Duffield that they were doing work inside the home, and it was a mess.

¶ 8        Duffield testified that there were two child and family team meetings between October 1, 2019, and July 1, 2020. At a November 2019 meeting, respondent was advised that the condition of the home remained unsuitable for the children to return. She was also advised to correct the conditions or face termination. Duffield testified that the source of the problem was the animals, so they tried to help the family come up with alternative places for the animals to live. Respondent indicated that the majority of the animals belonged to another adult female who lived in the home. It was explained to respondent and the father that they could move out of the

4

home so that respondent would only have one of the animals. Respondent indicated that if they got rid of their animals, the animals would die.

¶ 9        Respondent had admitted to Duffield that they were home when she visited but was "not sure why they [did not] hear [her] knocking whenever I come to the home." Respondent did allow Duffield to enter the home in June of 2020. Duffield observed that a door was on its side, bungee corded to the wall so animals could not get into the living room. Duffield saw multiple spots in the living room that appeared crystalized on the floor and had dried, indicating that it was dry urine. There was also a pile of feces in the left-hand corner by their cat box. The kitchen was overflowing with trash. Respondent indicated the father of A.S., Tevin S., had not taken it out. The kitchen had dirty dishes filling the sink. There was an extra refrigerator in the home that Duffield was told was broken. Duffield testified that at the permanency review hearing on July 1, 2020, respondent had acknowledged Duffield was in the home in June and that the home still needed work.

¶ 10        Duffield testified that between October 1, 2019, and July 1, 2020, there was never a time she felt comfortable returning the minors to respondent. Duffield explained that was because the home environment was still injurious to the welfare of the children. Two of the minors were toddlers, and toddlers put anything in their mouth. If the family continued to have feces and animal urine throughout the home, there was the risk the children would eat the feces or put toys in their mouths that had feces or urine on them.

¶ 11        On cross-examination, Duffield testified that visits between October 2019 and July 2020 were at the office. When the goal was return home, respondent was receiving visits every week for two hours. After the goal was changed to substitute care pending termination, visits were reduced to one a month. Respondent attended most of the visits. Duffield testified she had

5

concerns because during a couple visits respondent asked the ten-year-old R.A. to change the diapers of the two younger children. Respondent also had trouble watching all three children because the two youngest required a lot of attention. Duffield was concerned about the lack of supervision that C.B. received. There was concern that, at home with respondent, he would not be properly supervised and could put himself in danger. Respondent was loving towards A.S. and R.A. most of the time. She would mostly hold A.S. because he was little. Duffield testified R.A. had a strong bond with respondent because she spent the most time with respondent prior to DCFS involvement.

¶ 12      Duffield testified that respondent had homemaker services through Help at Home. A homemaker would come at least once a week into the home and help develop a budget and a schedule for cleaning. Duffield could not recall when, but the homemaker services were discontinued because it was determined the parents were not making progress and were not following their suggestions.

¶ 13      The State asked the circuit court to take judicial notice of Tevin S.'s stipulation to the petition to terminate filed on October 7, 2019, which was done without objection. The State then sought to proffer evidence about two of the fathers, Tevin S. and Daniel B. There being no objection, the State proffered, in relevant part, that Duffield would testify that respondent and Tevin S. lived together between October 1, 2019, and July 1, 2020. Between those dates, Duffield was not permitted entry into the house for several months. When Duffield was allowed inside, the condition of the house was unsanitary.

¶ 14      Respondent testified she completed a parenting class during the relevant period. She stated the sessions did not provide much regarding house cleaning, but did teach about "homemade chemicals, cleaning chemicals, and stuff like that." When asked if the classes

6

touched on cleanliness of the home, she indicated it did not. Respondent testified she was seeing a counselor with the Antioch Group, but she was not "getting anywhere with her." She was not given any goals in counseling and only discussed how she was feeling and why the children were taken. Respondent testified she had five or six certificates from the Partnering with Parents group. None of the speakers at the Partnering with Parents group spoke about house cleaning.

¶ 15 Respondent testified that, during the relevant period, she was doing two visits per month at the agency. She attended as many visits as she could. A "few months ago" she had her gallbladder removed and she could not make visits. She would get to the visits by walking or riding her bike. Because of the COVID-19 pandemic, respondent had video calls with the children. She denied she had trouble managing the little children and stated she paid attention equally to all three children. During visits, she would chase the children around the room playing "catch them if I could." The middle child would throw toys and pillows at respondent, and she would toss them back

¶ 16 Respondent testified that the caseworker came to the house one time right before the pandemic started and one time the month prior to the hearing. She disagreed with the caseworker regarding the condition of the home. She stated they were keeping the house clean. She agreed there were dishes in the sink and a few trash bags in the kitchen, but they were "getting chores done." She also agreed there were feces and urine in a "couple spots," but that they cleaned them up. Respondent testified there were three dogs and a cat in the house during the relevant period. One of the animals was hers and the other three belonged to her sister. Respondent stated they sent the animals to another relative, but they were returned after two weeks. Respondent stated the animals went outside to use the bathroom, they only had accidents at night, and they cleaned them up in the morning.

¶ 17     Respondent testified there were "only a few" times when she refused to let the caseworker into the home, saying that was when they were tearing up the old carpeting and laying new flooring in the living room. Respondent's house had three bedrooms upstairs, and they could make a bedroom in the basement. The house was fully furnished. If the children were to return to her, there would be one room for the boys and one for the daughter.

¶ 18     On cross-examination by the State, respondent testified that the case came into care because her house was a "mess." On cross-examination by the guardian *ad litem*, respondent testified that "mess" meant there was feces on the floor, trash in places it should not be, and dirty dishes. Respondent stated that, right after the accusation, they worked from "night to dawn" cleaning. Respondent acknowledged that there were other times the house had the same conditions later in the case, but stated they were "only a couple."

¶ 19     In rebuttal, the State called Britta Jost from CASA. At the November 2019 family team meeting, it was suggested to give the parents more opportunity to show the home was ready. CASA indicated it was willing to do an unannounced visit within the course of the next month. Jost testified she went to the home, knocked on the door, and was greeted by Tevin S. She told him it was the unannounced visit per the family team meeting. Tevin S. asked if she could come back another time and told Jost they were refinishing the floor of the living room, there were a lot of fumes, and he did not want her to enter at that time.

¶ 20     The State recalled Duffield who testified that respondent told her the family removed the carpet, which was heavily soiled with urine and feces marks. Duffield stated they were told multiple times that just removing the carpet was not enough to correct the conditions and that they needed to stop the animals from urinating and defecating throughout the house. Duffield stated she observed crystalized dry urine on the new flooring they had put down. Although

8

removing the carpet resolved some of the odor issues, there was still the issue of the animal feces throughout the home even on the new flooring.

¶ 21    The State argued respondent's psychological evaluation showed she had no issues preventing her from addressing the conditions of the home, yet she failed to do so. Respondent's counsel argued that respondent took parenting classes, did her psychological evaluation, engaged in individual counseling, and engaged in the volunteer service of Partnering with Parents. She let the agencies into her home on at least two occasions. Counsel asserted that none of the services she completed addressed the problem of a filthy house. Counsel argued the State had not met its burden. The guardian *ad litem* argued that the progress sought was correcting the conditions that brought the children into care. The guardian *ad litem* asserted the evidence presented demonstrated services were provided or offered that would have served them well in correcting the conditions here, but they did not correct them. This case involves a health hazard, a safety hazard, a danger, and an injurious environment to the children, and the conditions were not corrected.

¶ 22    Following argument, the circuit court found the State had met its burden of proving unfitness, stating that it was a "dirty home case" that started in September of 2018; and, during the relevant period, that condition did not change significantly. The court noted, "when you choose your pets over your children, as looks—as has been done in this case, this is the result." The court stated it did not see any progress during the relevant period.

¶ 23    On January 17, 2021, DCFS filed a best interest report for each of the minors. The reports indicated that the minors resided in the same foster home. R.A. had been in the home since February 6, 2020. C.B. and A.S. had been placed in the home on May 8, 2019, when C.B. was about one year old and A.S. about one month old. The foster parents signed the permanency

9

commitment forms and were willing and able to adopt the children. The minors' basic needs of food, shelter, clothing, and health were met by the foster parents. The foster parents had been together for 28 years and married for 24 years. The foster home was in good condition with no visible safety hazards or concerns and had adequate space for the family size. R.A. had her own room and C.B. and A.S. shared a room. The minors had adequate clothing to meet their needs, and they were always well groomed and dressed. The foster parents had an abundance of toys and learning materials throughout the house for each child's developmental age. The minors had regular "well child" exams and were up to date on immunizations. The foster parents were diligent in ensuring the minors' medical exams were current.

¶ 24    Regarding R.A., the reports indicated that she is in an individualized education program at school and has struggled with math and reading. The foster parents take her to Peoria at least twice a month for sensory therapy appointments and have obtained weekly tutoring services to help with her learning deficits. C.B., according to the reports, was tongue tied when he entered the foster home, but his condition was corrected shortly thereafter. He also required feeding, speech, and physical therapy, which the foster parents provided and ensured he attended. The reports also indicated that he had made progress that would be negatively affected if his therapy is discontinued. A.S. had some notable developmental delays in speech and motor skills. The foster parents provided speech and occupational therapy for these delays through Early Intervention Services.

¶ 25    The reports noted that respondent struggled to acknowledge that the condition of the home was injurious for her as well as for the minors. She had a limited support system. All three adults in the house had some developmental delays, which qualified them to receive Social Security Disability. Respondent visited the minors regularly, with only a few missed or canceled

10

visits. During the visits, respondent gave most of her attention to A.S. or R.A., leaving C.B. unattended. She failed to monitor C.B. and A.S.'s food intake, often rolling her eyes, making condescending remarks or ignoring the visitation specialist's reminders to do so. During many visits, respondent would ask R.A. to clean up the room rather than helping her clear away the mess all three children had made. During some visits, she would ask R.A. to change her brothers' diapers instead of changing them herself. R.A. reported she had to take care of C.B. when he was a baby because respondent was always sleeping. Respondent showed poor attunement to A.S.'s developmental needs. She dismissed a recommendation to lay A.S. on his belly to help strengthen his development.

¶ 26    The reports indicated that R.A. is attached to her foster mother and has sought her out when she was upset or had other needs. As a stay-at-home parent, the foster mother provides most of the nurturing in the home. She helps R.A. with homework and takes her to all of her medical appointments. C.B. is also very attached to the foster mother., seeking her out for his needs. C.B. had been in the home since he was at least 12 months old and, therefore, was the child most bonded to her. The reports also indicated that the minors are attached to the foster father as well. The foster father was observed to be loving and affectionate towards C.B. and A.S. The foster father is a pastor in the community in which the family lives. The family is very involved in their church and its activities. The foster father's employment is flexible, allowing him to help with the day-to-day care of the children when necessary. The foster parents are active in helping members of their church and local community. The reports recommended that it was in the best interests of the minors to terminate respondent's parental rights.

¶ 27    On April 9, 2021, the circuit court held a best interest hearing. Duffield testified that the current placement met the minors' basic needs of food, shelter, clothing, and health. She believed

11

R.A. had a strong bond with respondent, however, the relationship of C.B. and A.S. with respondent was "more of a visiting resource." Monthly visitation with respondent was a time in which R.A. sought attention from respondent but C.B. and A.S. "generally just play." The bond between all of the minors and the foster parents was strong and they were willing to adopt the minors. She noted that the best interest report filed in February 2021 was consistent with her observations. There were no updates since the report. Duffield also stated that no caseworker had visited respondent's house since December 2020 because the petition to terminate parental rights was proven in January. When the circuit court asked her if there was a "critical reason" causing her not to visit the house, Duffield stated: "I was made aware after the January court hearing, at the TPR petition hearing, that a threat was made to either harm me or kill me by the parents, so we filed a police report."

¶ 28        Respondent testified that she cleaned the house every day with Tevin S.'s help. She still had three dogs and one cat, "taking them out" and "clean[ing] up any messes." She stated that she had "gotten all the smells out" and visitors complimented the home's odor. Respondent stated she had only missed two or three visits. Her last visit was in February 2021 at the DCFS office. She felt that she had a bond with her children.  Her daughter wanted to be around her, and her sons never wanted to leave her side. The children called her "mommy." Respondent asserted she completed the tasks asked of her. She did not work outside of the home. She supported herself with social security insurance. She knew how to access public resources for food stamps. Respondent denied ever threatening a DCFS caseworker.

¶ 29        The State then argued that it was in the best interests of the minors to terminate the parents' parental rights as the relevant factors favored termination. It noted that respondent had cleaned up her residence, but it had been three years and she was unable to keep a clean

12

household environment. Respondent's counsel argued that, as of February 2021, respondent's house was in extremely good shape. Respondent's counsel asserted that losing children due to a dirty house when respondent had otherwise done services was "probably not" in the best interests of the children. The guardian *ad litem* argued there was a distinction between friendly visits and parenting. She stated that, throughout the case, the parents had been unable to consistently address the reasons for her children's removal. She found that, at the time of the termination, the condition of the house was deplorable and far from the condition needed for the minors' return. She did not believe the respondent had the consistent ability to manage the home in a way that was safe for the children. The guardian *ad litem* argued the best interest factors weighed in favor of termination.

¶ 30    The circuit court ruled that termination was in the best interest of the minors. First, the court noted the conditions causing removal had not been resolved because the animals were still present in the household. In relevant part, it stated:

> "I don't think the ultimate problem, the reason why this case came into care, has been taken care of. I think you've done a good job of cleaning this place up, but it's almost like cleaning the house up before the parents come home. You got it all done because you know somebody was coming over. And it looks okay, but the root of the problem has not been taken care of, I don't believe."

The court also noted that the foster parents were willing to adopt the children. (R.80) It found that the statutory factors favored the adoption of the children: (1) the physical safety and welfare favored the current placement; (2) the placement had lasted for over 2 years; (3) the minors continue to maintain familial, cultural, and religious ties; and (4) the minors have developed a

13

sense of attachment, security, familiarity, and continuity. The court also found that adoption was the least disruptive alternative.

¶ 31      The circuit court entered its order on April 15, 2021. Respondent now appeals this order.

¶ 32                                           ANALYSIS

¶ 33      Parental rights may be involuntarily terminated where (1) the State proves, by clear and convincing evidence, that a parent is unfit pursuant to grounds set forth in Section 1(D) of the Adoption Act, and (2) the circuit court finds that termination is in the child's best interests. 750 ILCS 50/1(D) (West 2019); *In re Donald A.G.*, 221 Ill.2d 234, 244 (2006). The State is not required to prove every ground it has alleged for finding a parent unfit. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 37 (citing *In re Gwynne P.*, 215 Ill.2d 340, 349 (2005)). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *Id.*

¶ 34      Pursuant to the Adoption Act, a parent is unfit if she failed "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2019). Reasonable progress under section 1(D)(m)(ii) requires "demonstrable movement toward the goal of reunification." *In re C.N.*, 196 Ill.2d 181, 211 (2001). On review, the circuit court's fitness determination will not be disturbed unless it is against the manifest weight of the evidence. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 38 (citing *In re Gwynne P.*, 215 Ill.2d at 354). A court's decision is against the manifest weight of the evidence where the opposite conclusion is clearly apparent. *Id.*

¶ 35      The manifest weight of the evidence shows that respondent failed to make reasonable progress toward sustained correction of the unsanitary and unsafe condition that constituted the

14

reason for the children's removal from her care. During the evaluation period, Duffield observed (1) multiple, crystalized spots on the living room floor; (2) a pile of feces in the left-hand corner; and (3) overflowing trash in the kitchen. Duffield testified that she believed the spots were dry urine. She also observed excess dishes in the kitchen sink and an extra refrigerator that she believed was broken. Duffield and the guardian *ad litem* both testified to a belief that, although the house was better than it had been when the children were removed, they doubted that it was *consistently* clean. Similarly, the trial court compared the situation to cleaning up for company. These conclusions were created and fostered by the actions of respondent herself. The evidence showed that respondent persistently denied access to anyone tasked with verifying her progress in keeping the house in a clean and healthy condition for the minors' return. In addition to her failure to make the needed changes, she neither mitigated the presence of her animals in the home nor found them alternate homes so the minors could return. She denies that the parenting classes taught her how to address the unsanitary conditions of the house or to understand their health implications for the minors. However, respondent's lack of cooperation blocked her from the help she needed to secure the return of the minors by achieving and demonstrating the relevant fitness or reasonable progress toward it. The finding of unfitness is supported by the manifest weight of the evidence.

¶ 36　　　　On a petition for termination of parental rights, once a finding of unfitness has been made, all considerations must yield to the best interest of the child. *In re O.S.*, 364 Ill. App. 3d 628, 633 (3rd Dist. 2006). At this stage of the proceedings, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re D.T.*, 212 Ill.2d 347 (2004). The trial court's decision requires consideration of statutory factors, including, inter alia: (1) the physical safety and welfare of the child, including food,

15

shelter, clothing, and health; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties, including church, school, and friends; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preference of the persons available to care for the child. 705 ILCS 405/1–3(4.05) (West 2019). The trial court's task requires the court to balance these factors, weighing them at the first instance, and places the court "in a better position to see the witnesses and judge their credibility." *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71 (internal citations and quotations marks omitted). Thus, on review, we accord the trial court's determination in a termination proceeding great deference and will not reverse it unless it is contrary to the manifest weight of the evidence. *In re O.S.*, 364 Ill. App. 3d at 633.

¶ 37        The relevant factors in this case show that the trial court's termination order was not against the manifest weight of the evidence. First, the current placement meets the minors' physical safety and welfare needs. The best interest reports indicated the foster home was in good condition with no visible safety hazards or concerns and had adequate space for the family size. R.A. had her own room and C.B. and A.S. shared a room. The minors had adequate clothing to meet their needs, and they were always well groomed and well dressed. The foster parents had an abundance of toys and learning materials throughout the house for each child's developmental age. The minors had regular "well child" exams and were up to date on immunizations. The foster parents were diligent in ensuring the minors' medical exams were current.

¶ 38 Second, the minors' educational and development needs favor permanent placement in the foster home. The reports indicated that each of the minors had some learning disability that required individualized therapy treatment: (1) R.A. had learning deficits and struggled with math and reading; (2) C.B was tongue tied when he entered the foster home; and (3) A.S. had some notable developmental delays in speech and motor skills. The foster parents have provided treatment opportunities which yielded significant progress. The report indicated that respondent and the other two adults with whom she resided also had some developmental delays. The foster parents also offer personal stability in that they had been together for 28 years and married for 24 years. As a stay-at-home parent, the foster mother provides most of the nurturing in the home. However, the foster father's employment is flexible allowing him to help with the day-to-day care of the children when necessary. In contrast, respondent consistently failed to follow basic requirements relevant to the minors' physical and developmental needs. During supervised visits, she failed to monitor C.B. and A.S.'s food intake, often rolling her eyes, making condescending remarks or ignoring the visitation specialist's reminders to do so.

¶ 39 Finally, the minors have bonded with the foster parents who are well suited to oversee and encourage the development of their identity. The reports indicated that R.A. is attached to her foster mother and has sought her out when she was upset or had other needs. As the primary nurturer, she also helps R.A. with homework and takes her to all her medical appointments. C.B. is also very attached to the foster mother., seeking her out for his needs. C.B. had been in the home since he was 12 months old and A.S. has literally known no other home. All of the minors are positively bonded with one or both of foster parents. Our review of the record does not disclose any risks to the minors as a result of adoption into this family. Again, the decision to terminate respondent's parental rights is supported by the manifest weight of the evidence.

¶ 40                                    CONCLUSION

¶ 41          The judgment of the circuit court of Peoria County is affirmed.

¶ 42          Affirmed