NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230688-U

NO. 4-23-0688

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 22, 2023
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
|     Petitioner-Appellee, | ) | No. 22JA15 |
|     v. | ) | |
| | ) | Honorable |
| Alisha H., | ) | David A. Brown, |
|     Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice DeArmond and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed the judgment of the trial court terminating
respondent's parental rights because the court's best interests finding was not
against the manifest weight of the evidence.

¶ 2   Respondent, Alisha H., appeals the trial court's order terminating her parental

rights to her minor child, J.M. (born in 2022). J.M.'s father is not a party to this appeal.

However, J.M.'s father appealed the termination of his parental rights in appellate court case No.

4-23-0689. Respondent argues the court's best interests determination was against the manifest

weight of the evidence. We affirm.

¶ 3   I. BACKGROUND

¶ 4   A. Case Opening

¶ 5   On January 28, 2022, the State filed a petition seeking to adjudicate J.M.

neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.*

(West 2022)). The State alleged J.M. was neglected due to being in an environment injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2022)). Specifically, the State alleged (1) respondent was found unfit in a prior case involving J.M.'s sibling and had not completed services to restore her to fitness, (2) respondent did not have custody of J.M.'s sibling, (3) respondent tested positive for cocaine when she gave birth to J.M., (4) J.M.'s sibling's umbilical cord tested positive for cocaine at birth, (5) respondent admitted to an investigator from the Illinois Department of Children and Family Services (DCFS) in January 2022 that she was using cocaine, (6) J.M.'s father would not submit to a drug test after being informed J.M. was placed under a safety plan due to respondent's issues, and (7) J.M.'s father had a criminal record in connection with his service in the United States Marine Corps.

¶ 6        On April 5, 2022, the trial court adjudicated J.M. neglected (705 ILCS 405/2-3(1)(b) (West 2022)). In a dispositional order entered the same day, the court found respondent unfit for reasons other than financial circumstances alone to care for J.M., made J.M. a ward of the court, and placed his guardianship and custody with DCFS.

¶ 7        On February 8, 2023, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was unfit for failing to make reasonable progress toward the return of J.M. to her care within nine months after the adjudication of neglect, specifically April 5, 2022, to January 5, 2023 (705 ILCS 50/1(D)(m)(ii) (West 2022)). At a May 20, 2023, fitness hearing, and pursuant to respondent's stipulation to the allegation, the trial court found the State proved she was unfit by clear and convincing evidence.

¶ 8                              B. Best Interests Hearing

¶ 9        On August 1, 2023, the trial court held a best interests hearing. FamilyCore caseworker Justin Sangalli testified J.M. was added at birth to a preexisting family case. J.M. had

been in the care of his foster parents (his maternal aunt and her husband) since he was born. The foster parents moved to a different home during the time J.M. was in their care, so he had lived with them in two homes—the first in Peoria and the second in East Peoria. Sangalli had visited both homes and found they were clean and appropriate. J.M. had his own bedroom in both homes and Sangalli found both rooms were appropriate for him. The home in East Peoria was approximately 10 minutes from J.M.'s maternal grandmother's home. This proximity facilitated J.M.'s contact with extended family members. Sangalli characterized the relationship between J.M. and his foster parents as "[v]ery bonded." J.M.'s foster parents had "raised him as their own *** from the time that he came home." J.M.'s foster parents provided love, affection, food, shelter, and clothing and ensured his medical needs were met. Sangalli opined that the foster parent placement was the least disruptive placement alternative for J.M. Sangalli did not feel respondent demonstrated sufficient stability for him to "even think" about returning J.M. to her care. Sangalli believed J.M.'s senses of security, familiarity, and continuity of affection were with his foster parents. J.M.'s foster parents also indicated their willingness to adopt him.

¶ 10    Emma M., J.M.'s maternal aunt and foster mother, testified J.M. resided with her and her husband since they picked him up from the hospital a few days after his birth. Emma provided food, shelter, and clothing for J.M. and ensured his medical needs were met. Emma believed J.M. was thriving in her care. Emma described the morning routine with J.M. and her husband; they wake up between 6 and 6:30 a.m. and eat breakfast together, and Emma takes J.M. to school at about 7:30 a.m. before going to work. When everyone is back home in the evening, they eat dinner and either visit Emma's parents or play at home together with their dog. Emma described the visitation between J.M. and his biological parents as sporadic at the beginning but acknowledged it had improved within the preceding six months. However, Emma observed only

a "minimal bond" between J.M. and his parents and this bond did not increase over time. During these visits, J.M. would become upset when he would see his foster parents walk away; he would enjoy his time with his biological parents "for a little bit," and then, after about 30 minutes to an hour, he is "done" and is "ready to just lay down or do something." Emma described J.M. being part of a "big family support system," which included his siblings and Emma's parents, great-grandmother, and husband and his family. Emma and her husband have wanted to adopt J.M. since he came into their home. On cross-examination, Emma acknowledged J.M.'s biological parents had brought clothes, food, and bottles for him when they came over for visits.

¶ 11 Respondent acknowledged her issues with substance abuse and how she began to "really address" those issues in October 2022, after she stole a television belonging to J.M.'s father's family. Respondent described being "tired of the drug life" and of "always doing wrong when [she had] children and [she] could better [her] life." This incident prompted respondent to enter inpatient drug treatment at a facility in Springfield, Illinois. Respondent acknowledged relapsing at least once after leaving that facility but asserted she had not used any illegal substances since February 2023. Respondent felt she was bonded with J.M. and stated she and his father "try to be loving [and] fun" during visits. Respondent and J.M.'s father had provided items such as strollers, diapers, bottles, blankets, clothes, a crib, and a car seat to her sister (J.M.'s foster mother) during his life. Respondent believed she had her substance abuse under control, stating she did not think about using drugs anymore and attended both Cocaine Anonymous meetings and an outpatient group. Respondent described still having "a lot of fight" left and maintained it was in J.M.'s best interests for her to remain a part of his life.

¶ 12 During closing arguments, the State emphasized how the testimony established (1) J.M. was thriving in his foster parents' home, (2) the foster home was clean and appropriate,

(3) he had a sense of familiarity, security, and continuity of affection with his foster parents, and (4) he and his foster parents were bonded with each other. The State also emphasized how J.M. was bonded with extended family members and his foster parents wanted to adopt him.

¶ 13　　Respondent's counsel argued respondent, J.M.'s father, and the foster family were all providing food, shelter, and clothing. According to respondent's counsel, this case involved the "complete opposite" of what often occurs, where biological parents do not provide in these ways. Counsel contended the pertinent statutory best interests factor should therefore be considered "a wash." Counsel argued the best interests factors pertaining to the development of the child's identity, wishes, and community ties were also "a wash." It was counsel's position that J.M.'s need for permanence was no longer an important consideration given respondent's period of sobriety. Finally, counsel maintained that the factor pertaining to the preferences of the people available to care for a child was likewise "a wash" because both the biological and foster parents wanted J.M. to be with them.

¶ 14　　The guardian *ad litem* (GAL) argued J.M.'s physical safety and welfare rested with his foster parents. While both biological parents had provided to some extent, "the vast majority of shelter, clothing and food comes from the foster parents." The development of J.M.'s identity, his sense of familiarity, his continuity of affection, and his least disruptive placement all were with the foster parents. According to the GAL, (1) the foster placement was "the only home that [J.M.] knows," (2) J.M. was "extremely bonded to the foster parents," and (3) the foster parents were willing to provide permanency through adoption.

¶ 15　　The trial court acknowledged that both biological parents "doubled down starting sometime in February of this year," but only in response to the State's petition to terminate their parental rights. The court also acknowledged that while both the foster parents and biological

parents "have contributed to [J.M.'s] general welfare during the course of the case," his "physical safety has been provided for by the foster parents." The court stated J.M.'s senses of attachment, security, and familiarity were with his foster parents but recognized his continuity of affection "comes from a lot of different directions." The court then stated, "[T]he risk of substitute care is this notion that substitute family or parents won't have the same bond, concern, or responsibility for a child somehow that the natural parents would have, and I don't think that's the case in this situation." Regarding the need for permanency, the least disruptive placement, the senses of security and familiarity, and J.M.'s bond with his foster parents, the court found it would be in his best interests to terminate respondent's parental rights. The court named DCFS as guardian and changed the permanency goal to adoption.

¶ 16         This appeal followed.

¶ 17                              II. ANALYSIS

¶ 18         On appeal, respondent challenges only the trial court's best interests finding, arguing it was against the manifest weight of the evidence. We disagree.

¶ 19         Following a finding of parental unfitness, the trial court's focus shifts away from the parents, and the court gives full and serious consideration to the minor's best interests. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). At the best interests stage of termination proceedings, the State must prove by a preponderance of the evidence that termination is in the minor's best interests. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. In making the best interests determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 20          A reviewing court affords great deference to a trial court's best interests finding because the trial court is in a superior position to view the witnesses and judge their credibility. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *C.P.*, 2019 IL App (4th) 190420, ¶ 68. A best interests determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *C.P.*, 2019 IL App (4th) 190420, ¶ 68.

¶ 21          At the time of the best interests hearing, J.M. had been in the care of his foster parents since he was born. J.M. had lived with his foster parents in two clean and appropriate

homes in the Peoria area and had his own appropriate bedroom in both homes. J.M.'s foster parents raised him as if he was their own child and they were bonded to one another. J.M.'s foster parents were facilitating his relationships with an extensive family support system, which included both foster parents' families. J.M.'s foster parents provided love, affection, food, shelter, and clothing for him and ensured his medical needs were met. While respondent was visiting J.M. with an increased frequency, the evidence demonstrated there was only a minimal bond that did not improve during this period. Sangalli testified J.M.'s foster parents were the least disruptive placement alternative. According to Sangalli, respondent's circumstances were such that he could not "even think" about returning J.M. to her care. Sangalli testified J.M.'s security, familiarity, and continuity of affection were all with his foster parents, who provided him the only home he ever had and were willing to adopt him.

¶ 22 Based on the evidence presented and in light of the statutory factors carefully considered by the trial court, the court's decision that it was in J.M.'s best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 23                                                    III. CONCLUSION

¶ 24          For the reasons stated, we affirm the trial court's judgment.

¶ 25          Affirmed.