NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210326-U

NOS. 4-21-0326, 4-21-0327 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 19, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* My.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
|       Petitioner-Appellee, | ) | Nos.   19JA12 |
|       v.    (No. 4-21-0326) | ) |        19JA49 |
| Myquan B., | ) | |
|       Respondent-Appellant). | ) | |
| | ) | |
| ———————————————————— | ) | |
| | ) | |
| *In re* Mi.B., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|       v.    (No. 4-21-0327) | ) | Honorable |
| Myquan B., | ) | Matthew D. Lee, |
|       Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the judgments of the trial court terminating
respondent's parental rights because the trial court's findings were not against the
manifest weight of the evidence.

¶ 2          Respondent, Myquan B., is the father of My.B. (born July 2018) and Mi.B. (born

August 2019). In April 2021, the trial court found respondent was an unfit parent, and in June

2021, it found termination of respondent's parental rights would be in the minor children's best

interests. Respondent appeals, arguing that the trial court's fitness and best-interest

determinations as to each child were against the manifest weight of the evidence. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4                          A. The Proceedings Relating to My.B.

¶ 5          In March 2019, the State filed a petition for adjudication of wardship in My.B.'s case, alleging My.B. was a neglected minor in that she lived in an environment injurious to her welfare when living with respondent because respondent exposed her to domestic violence. See 705 ILCS 405/2-3(1)(b) (West 2018). In May 2019, the trial court adjudicated My.B. a neglected minor.

¶ 6          In June 2019, the trial court conducted a dispositional hearing at which it entered a written order making My.B. a ward of the court and finding respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minors, and it would be contrary to My.B.'s health, safety, and best interest to be in his custody. The court placed guardianship and custody of My.B. with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS). The written order also stated, "The respondent mother and father are advised that if they fail to correct the conditions which required the child to be in care by completing the service plans, cooperating with any after-care plan and complying with the terms of this order, they risk termination of parental rights."

¶ 7          In August 2019, respondent was arrested on charges of domestic battery and aggravated battery.

¶ 8                          B. The Proceedings Regarding Mi.B.

¶ 9          Also in August 2019, Mi.B. was born and taken into protective custody two days

later. The State filed a petition for adjudication of wardship in Mi.B.'s case, alleging that Mi.B. was a neglected minor in that she lived in an environment injurious to her welfare when she lived with respondent or her mother because "said parents have failed to correct the conditions which resulted in a prior adjudication of parental unfitness to exercise guardianship and custody of the minor's sibling [My.B.,] in Champaign County Case No. 19-JA-12." At the shelter care hearing conducted the same day, respondent stipulated to the issues of probable cause and urgent and immediate necessity, and the court placed temporary custody and guardianship of Mi.B. with the guardianship administrator of DCFS.

¶ 10　　　　　In October 2019, the court adjudicated Mi.B. a neglected minor. In November 2019, the court conducted a dispositional hearing, at which it adjudicated Mi.B. a ward of the court, found respondent unfit to care for Mi.B., and placed guardianship of Mi.B. with the guardianship administrator of DCFS. The court found (1) respondent unfit for reasons other than financial circumstances alone to care for Mi.B. and (2) it was in Mi.B.'s best interest to remain in the custody of DCFS.

¶ 11　　　　　In March 2020, respondent was arrested for residential burglary, and in August 2020, he was sentenced to five years in prison for that offense.

¶ 12　　　　　　　　　　C. The Termination Hearings

¶ 13　　　　　In December 2020, the State filed petitions to terminate respondent's parental rights to My.B. and Mi.B. The State alleged respondent was unfit because he failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare, (2) make reasonable efforts to correct conditions which were the basis for the children's removal during the nine-month period of February 2020 to November 2020, and (3) make reasonable progress toward the children's return to him during the same nine-month period. 750

ILCS 50/1(D)(b), (m)(i), (ii) (West 2018).

¶ 14          1. *The Proceedings Addressing Respondent's Parental Fitness*

¶ 15          In April 2021, the trial court conducted a hearing on the parental fitness portion of the termination proceedings.

¶ 16          Ellen Pierce testified that she worked as a child welfare specialist for Lutheran Social Services and was the caseworker from August 2019 until December 2019. She met respondent once at the courthouse in September 2019 and explained what he would be expected to do in order to regain custody and guardianship of his children. She referred respondent to parenting education, domestic violence classes, a psychological evaluation, and anger management classes. Pierce explained that she notified respondent of the referrals by voicemail, letters, or both. Pierce stated respondent participated in one session of parenting education classes and attended one visit with his children. Otherwise, respondent had no contact with Pierce and did not attend services.

¶ 17          Sarah Lacox testified she formerly worked for Lutheran Social Services and was the caseworker from December 2019 until September 2020. In December 2019 and January 2020, she attempted to contact respondent by calling him and leaving voicemail messages. Despite these efforts, she had no contact with respondent. Respondent never participated in any of the services to which he had been referred and did not attend any visits with the children. In April 2020, respondent's mother informed Lacox that respondent was in prison.

¶ 18          Lori Zindars testified she worked for Lutheran Social Services and was the current caseworker. She testified that she had no communication with respondent and no information from providers that would suggest he had engaged in or completed any services.

¶ 19          Celena B., respondent's mother, testified that respondent was in prison and he

maintained daily contact with her. Celena stated that she helped with caring for the children and reported that respondent asked about the children "all the time." Celena further testified that respondent told her he was taking classes, pursuing his General Educational Development (GED) certification, and was in counseling.

¶ 20 Ceairra B., respondent's older sister, was a foster parent of the children. She said that respondent telephoned from prison, asked about the children, talked to them, and maintained an interest in how they were doing. Ceairra testified that before respondent went to prison, he "made sure they had stuff. He made sure to give us money to make sure they had clothes, and Pampers, and stuff like that."

¶ 21 Respondent testified he was currently in prison and had been in custody since March 2020. Respondent stated he was participating in GED classes on a weekly basis and engaging in mental health counseling at least once a month. He was also on waiting lists for other services, including parental education. Respondent said that, prior to his incarceration, he provided "[t]oys, Pampers, everything I can" to his children and he intended to give his $1200 stimulus check to his mother to pay for their care. Respondent's "out date" was in September 2022, but he hoped to be released on home monitoring in September 2021. Respondent testified that he spoke to his sister and mother every day and always asked how My.B. and Mi.B. were doing.

¶ 22 The trial court determined that the State had not proved the allegations regarding lack of interest, concern, or responsibility, but had proved the allegations regarding (1) reasonable efforts and (2) reasonable and substantial progress. The court found that, although respondent loved his children and was making efforts in prison, he had not engaged in services before he was incarcerated and had not made progress towards returning the children home.

¶ 23                    2. *The Proceedings Addressing the Children's Best Interests*

¶ 24            In June 2021, the trial court conducted a hearing on the issue of whether terminating respondent's parental rights was in the children's best interests. The parties stipulated that if called to testify, Zindars would testify consistently with the best interest report she prepared for the court. The report noted that My.B. and Mi.B. were doing very well in their foster placement with respondent's sister, Ceairra. Ceairra had a full-time job, a stable home, and was eager to provide the children permanency. Ceairra was also a biological relative, and the children were "very closely bonded" to her.

¶ 25            The trial court found termination to be in both children's best interests and terminated respondent's parental rights. The court noted that the children's sense of familial ties and developing identity were strongly supported by the relative placement, which further meant that respondent could develop a relationship with the children even if his rights were terminated. The court found that all indications were that the children were happy, healthy, and well taken care of in their current placement with Ceairra, who was willing to provide permanency through adoption.

¶ 26            This appeal followed.

¶ 27                                  II. ANALYSIS

¶ 28            Respondent appeals, arguing that the trial court's fitness and best-interest determinations as to each child were against the manifest weight of the evidence. We disagree and affirm.

¶ 29                          A. The Fitness Determinations

¶ 30            Respondent argues the trial court's findings that respondent failed to make reasonable efforts and reasonable progress in each case were against the manifest weight of the

evidence. It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805. Based on our review of the record, we conclude that the court's findings that respondent failed to make reasonable progress within the applicable nine-month period were not against the manifest weight of the evidence. Accordingly, we discuss only those findings.

¶ 31                                  1. *The Applicable Law*

¶ 32          The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2018). Reasonable progress is an objective review of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps. *In re Ta.T.*, 2021 IL App (4th) 200658, ¶ 51. Reasonable progress exists when the trial court can conclude that, in the near future, it will be able to order the children returned to parental custody. *Id.*

¶ 33          A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 34                                  2. *This Case*

¶ 35 Here, the caseworkers testified that, despite their repeated efforts, they were unable to speak with respondent. They further explained that they never received any indication that respondent engaged in services. Respondent was arrested at the beginning of the nine-month period for residential burglary and received a five-year prison sentence. Respondent testified that he was participating in some services in prison but his progress in those services was slow and he was on several waiting lists. And, as the trial court noted, respondent did not make efforts to engage in services prior to his arrest and incarceration. In short, the evidence presented did not give any indication that respondent had made demonstrable progress toward reunification. Accordingly, we conclude that the trial court's findings were not against the manifest weight of the evidence.

¶ 36                                  B. The Best-Interest Determinations

¶ 37                               1. *The Applicable Law and Standard of Review*

¶ 38 At the best-interest stage of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with

- 8 -

parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953.

See also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 39 A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 40                                        2. *This Case*

¶ 41 The children in this case were very young when they were taken into care and spent most of their lives with their foster mother, Ceairra, who was also respondent's sister. The trial court as well as the parties relied heavily on the detailed best-interest report from Zindars documenting My.B. and Mi.B.'s home life. Ceairra provided much needed stability and emotional support. The children were very strongly bonded with Ceairra and were integrated into the family. Ceairra was also willing to provide permanency through adoption. The court noted that because the children were being cared for by respondent's sister, respondent would have an opportunity to develop a relationship with them in the future, which the court believed was an important consideration. In sum, the court indicated that My.B. and Mi.B. were happy and thriving in their current placement. We conclude the trial court's findings that termination was in the children's best interest were well supported by the record.

¶ 42                          III. CONCLUSION

¶ 43          For the reasons stated, we affirm the trial court's judgments.

¶ 44          Affirmed.